[No. S004705. Crim. No. 25181. May 3, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DEE MATTSON, Defendant and Appellant.

**COUNSEL**

Eric S. Multhaup, under appointment by the Supreme Court, and Kathy M. Chavez for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edwart T. Fogel, Jr., Assistant Attorney General, Andrew D. Amerson, Susanne C. Wylie, William T.

Harter, Donald E. Denicola and Keith H. Borjon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EAGLESON, J.—On October 22, 1984, this court reversed a judgment of conviction and sentence imposing the death penalty, holding that defendant's confessions to the two murders, related offenses, and unrelated sexual offenses of which he stood convicted had been obtained in violation of article I, section 15 of the California Constitution and therefore were inadmissible under *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] and *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. (*People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887].)

Defendant was retried. At the second trial, a new pretrial hearing was held to determine the admissibility of the confessions, new evidence was presented, and once again the trial court ruled that the confessions were admissible.

After a trial that began on December 10, 1985, the jury convicted defendant of count I, the July 14, 1978, wilful, deliberate, and premeditated murder of Cheryl G. (Pen. Code, §§ 187, 189),[1] under special circumstances of murder committed during the commission or attempted commission of rape (former § 261, subd. (2)) and lewd and lascivious conduct on a child under the age of 14 (§ 288) (former § 190.2, subd. (c)(3)(iii) & (iv)), and multiple murder (former § 190.2, subd. (c)(5)); count II, kidnapping of Cheryl G. (§ 207) with intentional infliction of great bodily injury (§ 12022.7); count III, rape of Cheryl G. with great bodily injury; count IV, lewd conduct with Cheryl G. with great bodily injury; count VI, the September 6, 1978, wilful, deliberate and premeditated first degree murder of Adele C. with special circumstances of murder during the commission or attempted commission of kidnapping and rape, and multiple murder; count VII, kidnapping of Adele C.; count X, the September 10, 1978, kidnapping of Kiz L.; count XI, rape of Kiz L.; count XII, sodomy of Kiz L. (§ 286); and count XIII, oral copulation of Kiz L. (§ 288a).

The penalty trial began on December 26, 1985. The jury returned a verdict of death on each murder count on January 8, 1986, after a day of

---

[1] All references herein to code sections are to the Penal Code unless otherwise indicated. Because this case is governed by the 1977 death penalty law, references to sections 190.2-190.4 are to former sections that were repealed by the November 7, 1978, initiative death penalty law. (See Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262.)

deliberation. Judgment was pronounced on February 7, 1986, at which time defendant was sentenced to death on each murder count and to the upper term of five years with a three-year enhancement on counts II, III, IV, and VII; to the upper term of five years on counts X, XI, and XII; and to the upper term of three years on count XIII.

This appeal is automatic. (§ 1239, subd. (b).)

Defendant's principal contentions are that he was denied his right under article I, section 16 of the California Constitution and the Sixth Amendment to the United States Constitution to trial by a jury drawn from a representative cross-section of the community, and that the trial court erred in permitting relitigation of the admissibility of, and in admitting, his confessions. He also asserts a double jeopardy claim; error in denying funds requested pursuant to section 987.9; errors in ruling on objections to evidence, arguments and instructions; failure of the People to establish the corpus delicti of certain special circumstances; ineffective assistance by trial counsel who failed to move for severance of, and separate trials on, the three groups of offenses; and error in instructing the jury.

With respect to the penalty trial, defendant claims error in admitting evidence regarding events underlying his prior convictions; error in permitting a witness to be examined on future dangerousness; and error in ruling on the automatic application for modification of the verdict.

We conclude that none of these claims has merit. The judgment will be affirmed in all respects.

I.

SUMMARY OF EVIDENCE

A. *Guilt Phase.*

1. *Cheryl G.*

Nine-year-old Cheryl G. disappeared from the parking lot of Santa Fe Springs High School in Los Angeles County on July 14, 1978. Cheryl had been swimming with her older sisters who had left her briefly while they went to telephone their mother who was to pick them up. Cheryl was wearing a two-piece swimming suit and a pair of thongs, and carried a towel.

The plant foreman at the high school saw a young Hispanic girl waiting near the gate of the parking lot when he left work at about 3:30 p.m. on that date. He also saw a young man with long, dark hair and a beard. The man, who looked very much like defendant, was sitting in a car within 20 feet of the girl. The car was yellow or orange, had mud streaks on the sides, and had brush marks on the passenger side of its top.

Cheryl's body was found on July 15, 1978, in the Legg Lake region of the Whittier Narrows Recreation Area. She was nude. The top of her swimming suit was wrapped around her neck, as were a piece of monofilament fishing line and a "Handy Wipe." Fecal matter was found on the cheeks of her buttocks and the inner side of her thigh. Death was caused by asphyxiation by ligature strangulation and/or suffocation. She had suffered injuries consistent with blows to the head. Her hymen was not intact.

Defendant subsequently confessed to investigators that he had picked up a Hispanic girl in the parking lot of the Santa Fe Springs High School, had driven to Legg Lake, had intercourse with the girl in the bushes, and then strangled her with his belt and tied fishing line around her neck. Information about the ligature had not been released to the public by investigators at the time defendant confessed.

### 2. *Adele C.*

Sixteen-year-old Adele C. was last seen alive by her mother on September 6, 1978. Adele's mother had dropped her off at 8:30 a.m. on a street corner where Adele was to be picked up by friends who were to give her a ride to her part-time job at a motel on the Pacific Coast Highway. Adele was wearing a white eyelet blouse with straps, a hooded multicolored sweater, jeans, and blue tennis shoes. She also wore a pukka shell necklace. She did not report to work that day.

Adele's remains were located in a wooded area in Duarte on November 9, 1978, by an officer who followed directions given him by Detective Reed who was then in Nevada. The cause of death could not be determined. The body had a pukka shell necklace, white eyelet blouse, and a blue tennis shoe on it. There was no underwear on the body.

Detective Reed obtained his information about the location of Adele's remains from defendant while interrogating defendant about the Cheryl G. murder. Defendant volunteered information about this killing, stating that he had picked up a 16-year-old girl who was hitchhiking, had taken her to a remote area of Duarte off the Foothill Freeway, had intercourse with her 3 times, and then strangled her.

### 3. *Kiz L.*

On September 10, 1978, 15-year-old Kiz L., who lived in Seal Beach (Orange County), missed the bus to Huntington Beach and started hitchhiking. Defendant picked her up, but before reaching the location to which she had told him she was going, made a U-turn, pulled out a knife, and told her to lock the door of the car. Defendant was driving a yellow car. He drove north onto the 605 Freeway where he pulled over and got out, saying he had to urinate. When Kiz left the car, he grabbed her, apologized for scaring her, threw the knife away, and promised to take her home. Instead he drove to an area near Diamond Bar, forced her to leave the car and walk to a desolate area, forced her to orally copulate him and raped and sodomized her. He then removed his belt and told her he was going to hang her. Finally, however, he threw the belt away, saying that he could not kill her.

Kiz escaped from defendant's car when he stopped to buy beer. She identified defendant as the person who had kidnapped and assaulted her, and she testified at the trial. Defendant confessed that he had kidnapped, raped, sodomized and orally copulated Kiz, and that he had intended to kill her.

### 4. *Defense Evidence.*

Defendant sought to discredit his confessions by establishing that he had falsely confessed to the July 20, 1978, murder of Deanna M. in Riverside County. He introduced evidence that he had been at work at the time of the offense. The prosecution offered evidence in rebuttal tending to show that defendant's confession included details with which only the killer would be familiar.

### B. *Penalty Phase.*

The prosecution offered evidence that on September 20, 1978, appellant entered the car of Sonia L. when she returned to her car in the parking lot of the North Las Vegas Community College from an evening class. He demanded money, and drove into the desert where he raped her. She escaped from the car when he returned to the city and stopped for gas. Defendant was convicted of the kidnapping, robbery, and rape of Sonia L. in January 1979.

Evidence of the August 1, 1971, kidnapping and rape of Jeanette K. in Oregon was also presented. Jeanette and her younger brother Joe picked up defendant, who was hitchhiking. When they pulled over because defendant

said he wanted to get out, defendant forced Joe from the car at knifepoint, and ordered Jeanette to drive on and to pull into a wooded area off the freeway where he raped her.

Mitigating evidence was offered by defendant in the form of expert testimony that defendant had been diagnosed as suffering from schizophrenia attributable to major traumatic childhood experiences;[2] the deprivation and abuse he had suffered as a child; his history of sexual identity problems that led him to "cross-dress" as a child, and drug abuse; and of his exemplary behavior in prison from 1980 to 1984, during which time defendant received psychotropic drugs.

## II.

### JURY SELECTION

#### A. *Underrepresentation.*

■ Both the Sixth Amendment of the United States Constitution and article I, section 16 of the California Constitution guarantee a defendant the right to trial before a jury drawn from a representative cross-section of the community. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 528 [42 L.Ed.2d 690, 696-697, 95 S.Ct. 692]; *People* v. *Bell* (1989) 49 Cal.3d 502, 525 [262 Cal.Rptr. 1, 778 P.2d 129].) That guaranty mandates that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (419 U.S. at p. 538 [42 L.Ed.2d at p. 703].) The petit jury that actually tries the case need not itself mirror the community, however, and states are free to permit reasonable exemptions and to prescribe qualifications relevant to the ability to serve as a juror. (*Ibid.*)

■ When a fair cross-section challenge to the jury selection procedure is made, the defendant bears the initial burden of demonstrating a prima facie violation of the fair cross-section requirement. To do so he must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664].)

---

[2] A plea of not guilty by reason of insanity, entered prior to the first trial, was withdrawn before the retrial commenced.

The jury selection process to which defendant objects is one that was peculiar to Los Angeles County in which 11 judicial districts existed at the time of defendant's trial. Each of those districts summoned jurors from the surrounding area, but in compliance with former section 203 of the Code of Civil Procedure no prospective juror was assigned to a courthouse more than 20 miles from his or her residence.[3] The Central Judicial District, which needs a greater number of jurors than do the outlying districts, drew from the pool or wheel first. Because its 20-mile limit overlapped that of the Southeast Judicial District (Norwalk), the Norwalk court drew from a more restricted area. Defendant's evidence established that while the area within a 20-mile radius of the Norwalk courthouse had a high population of Blacks and Hispanics, the population of the smaller area from which the Norwalk court drew jurors was predominantly White.[4] In 1985, the Black population of the 20-mile region was 16.3 percent, but the percentage of Blacks on Norwalk venires was only 3.2 percent. The percentage of Hispanics in the same region was 34.8, but they constituted only 15.1 percent of the venires.[5]

The county's director of jury services testified, however, that no disparity existed with respect to the percentage of Blacks in the population and on Norwalk jury venires, from either a countywide perspective or at the judicial district level.[6] With respect to the latter, in September and October of 1985, 3.6 percent of the jurors appearing for duty in Norwalk were Black, while the Black population of the Southeast Judicial District was 2.9 percent.

The same witness also testified with respect to Hispanic jurors, that 40.8 percent of the Hispanic population of the county (and the Southeast

---

[3] Former section 203 of the Code of Civil Procedure was repealed in 1988 (Stats. 1988, ch. 1245, § 1). The current statute provides: "(a) All persons are eligible and qualified to be prospective trial jurors, except the following:

". . . . . . . . . . . . . . . .

"(4) Persons who are not residents of the jurisdiction wherein they are summoned to serve."

[4] The evidence presented by defendant indicated that of 700 census tracts within the 20-mile radius, 504 sent no prospective jurors to the Norwalk courthouse during the 1985 period studied by his expert. One tract sent 57 jurors. Almost 68 percent of the census tracts supplied no jurors to Norwalk. Those tracts that provided the jurors were White areas.

Los Angeles County itself has 4,300 census tracts, of which only 173 are in the Southeast Judicial District.

[5] Similar disparities for earlier years were also demonstrated. In 1982, the percentage of Blacks on Norwalk venires was 6.2; in 1980, 7.4 percent; and in 1979, 5.1 percent. In 1982, Hispanics comprised 10.6 percent of the venires; in 1980, 13.6 percent; and in 1979, 8 percent.

[6] On motion of defendant the court had ordered the county director of jury services to survey the jury pool in the Southeast Judicial District for the July 15, 1985—October 4, 1985, period. The survey was to obtain a profile of the prospective jurors and requested information regarding age, sex, marital status, race or ethnic origin, occupation, education, and family income.

Judicial District) were not citizens, and that the presumptively jury-eligible Hispanic population was only 20.5 percent. Defendant's expert found no basis other than speculation for these conclusions.

■ Defendant contends that the method of assigning prospective jurors to the Norwalk courthouse at the time his jury was selected caused constitutionally impermissible underrepresentation of Blacks and Hispanics on the venires.

We disagree. That Blacks and Hispanics are "distinctive" groups is undisputed. Defendant fails to satisfy the second *Duren* prong, however. His claim assumes that the area within the 20-mile radius of the Norwalk courthouse is the relevant "community" against whose population the representation of cognizable groups is to be measured. We have recently held, contrary to this assumption, that the relevant community for cross-section analysis is the judicial district. (*Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 745 [263 Cal.Rptr. 503, 781 P.2d 537].) Since the record does not demonstrate a disparity when the population of this community is used for comparison purposes, defendant has not established a prima facie violation of the cross-section guaranty.

B. *Witherspoon-Witt Error.*

■ The Sixth Amendment guaranty of a fair and impartial trial also precludes exclusion from the jury in a capital case those jurors who express general objections to the death penalty, or conscientious or religious scruples against its infliction. (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].) A prospective juror may be excluded for cause if his views regarding the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521].)

In applying this standard, the prospective juror's unwillingness to consider imposition of the death penalty need not appear with "absolute clarity." It is enough that following voir dire of the jury "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 426 [83 L.Ed.2d 841, 852, 105 S.Ct. 844].) This standard is also applied in assessing the propriety of an excuse for cause under article I, section 16 of the California Constitution. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1165 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Defendant claims that the trial court erred in restricting his effort to "rehabilitate" by further examination of prospective jurors whose responses on voir dire to inquiry regarding their views regarding capital punishment led the court to excuse them for cause. Defendant does not contend that, on the record made during voir dire, the court erred under either *Witherspoon*, which was then understood to state the proper standard, or *Witt*, which has since refined the test. He claims only that the court unreasonably denied him the opportunity to further examine the jurors after they expressed reservations about capital punishment.

The duty to examine prospective jurors and to select a fair and impartial jury is a duty imposed on the court, although counsel must be given reasonable opportunity to examine the prospective jurors. (Code Civ. Proc., § 223, subd. (a); Pen. Code, former § 1078.) Counsel may conduct that voir dire of prospective jurors to determine the basis for a challenge for cause. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 182 [222 Cal.Rptr. 184, 711 P.2d 480].) In the general voir dire, this right includes examination of the prospective jurors about their attitudes toward specific legal doctrines they may be called upon to apply. (*Ibid.*) When a bias that may form a basis of a challenge for cause appears during such voir dire, opposing counsel may seek to rehabilitate the prospective juror, but this further voir dire, like that directed to uncovering bias, is subject to reasonable limitation at the discretion of the trial judge.

Here we deal with the death qualification process and the sequestered voir dire mandated by *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]. The only question the court need resolve during this stage of the voir dire is whether any prospective juror has such conscientious or religious scruples about capital punishment, in the abstract, that his views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (See *Wainwright* v. *Witt, supra,* 469 U.S. at p. 420, italics omitted [83 L.Ed.2d at p. 849] [quoting *Adams* v. *Texas, supra,* 448 U.S. 38, 45 (65 L.Ed.2d 581, 589)]; *People* v. *Clark, ante,* 583, 596-597 [268 Cal.Rptr. 399, 789 P.2d 127].) As we noted in *People* v. *Clark, supra,* at page 597, this "death qualification" voir dire seeks only to determine if, because of his views on capital punishment, any prospective juror would vote *against* the death penalty without regard to the evidence produced at trial. (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 416 [83 L.Ed.2d at pp. 846-847]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 250 [253 Cal.Rptr. 55, 763 P.2d 906].)

The question posed by defendant, whether or not hypothetical, was not relevant to death qualification. The jurors who were excused had each

expressed clearly an inability or unwillingness to vote for imposition of the death penalty.[7]

When a juror has clearly expressed an inability to vote for the death penalty regardless of the evidence that may be produced at trial, the court has discretion to limit further voir dire directed toward persuading the juror that there may be some circumstance which he has not considered that could cause him to modify his conscientious or moral attitude toward the death penalty. (*People* v. *Fields* (1983) 35 Cal.3d 329, 357-358 [197 Cal.Rptr. 803, 673 P.2d 680].)

We find no abuse of that discretion here. In the three instances complained of, defendant sought to ask if the prospective juror would be able to impose the death penalty if the People proved beyond a reasonable doubt that the defendant would pose a danger to guards or other inmates if

---

[7] Juror D. had stated that she did not believe in the death penalty, and would vote for less than first degree murder or to find a special circumstance allegation false in order to avoid reaching the penalty phase. When the option to vote for life without possibility of parole was explained, she stated that she could find the defendant guilty of first degree murder and could vote to find a special circumstance true. In response to a subsequent question by the court, however, she said: "I would never vote for a verdict of death." When asked by the prosecutor if she was "saying that regardless of the evidence and because of your conscientious objection to the death penalty, you would, in every case, automatically vote for life imprisonment without the possibility of parole and never vote for a verdict of death," she replied: "That's correct."

Juror C. had also stated that she did not believe in the death penalty, would refuse to vote for a first degree murder verdict or to find a special circumstance allegation true, and would automatically vote for life imprisonment without the possibility of parole. Additional questions were asked by defendant's counsel because another answer, that she would automatically vote for death, was inconsistent and indicated that she was confused by the court's questions on voir dire. When the option of life without possibility of parole was explained, she said she could vote for a first degree murder verdict and to find a special circumstance allegation true. Counsel made no attempt to question her further regarding her statement that she would automatically vote for life imprisonment other than the attempt to pose the hypothetical question. The court assured him that no limit was being placed on his effort to rehabilitate the prospective juror other than sustaining the People's objection to that specific question, but counsel declined the opportunity, stating "that's the key question . . . the defense wishes to ask on rehabilitation."

Juror F. also stated that she did not believe in the death penalty and would vote for something other than first degree murder or to find a special circumstance allegation false to end the death penalty question. She, too, then agreed that if she had an option to vote for life without possibility of parole, she could vote for a first degree murder verdict and to find a special circumstance allegation true, but she displayed confusion by stating that she would automatically vote for death and for life imprisonment.

Then, after she agreed, in response to defense counsel's clarifying question that she would vote for life imprisonment, defense counsel asked if she had strong views about the death penalty to which she replied: "Religious belief." Again, counsel made no further inquiry other than an attempt to ask the same hypothetical question. This juror was excused after she once again responded "yes" to the prosecutor's inquiry if she was saying that she "would in every case automatically vote to impose life imprisonment without possibility of parole and would never vote for a verdict of death."

sentenced to life imprisonment without possibility of parole. When the court sustained the People's objection, defendant declined the opportunity to conduct further voir dire of the prospective jurors and made no attempt to make a more general inquiry regarding their willingness to vote for imposition of the death penalty if they were satisfied that the defendant might commit future crimes and thus pose a danger to the community. (See *Barefoot* v. *Estelle* (1983) 463 U.S. 880, 896-905 [77 L.Ed.2d 1090, 1106-1112, 103 S.Ct. 3383].)[8]

C. *Denial of Funds.*

■ The trial court denied defendant's motion, made pursuant to section 987.9, for funds to employ an expert in jury selection. In support of his motion defendant had claimed that the assistance of an expert in jury selection should be authorized because counsel lacked experience in selecting juries under the death qualification process established by *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1; the inflammatory nature of the charges increased the difficulty of selecting impartial jurors; counsel had been economical in other phases of trial preparation; and the cost of an expert was modest. The expert defendant hoped to engage was a psychologist experienced in assisting counsel in the selection of juries. He sought funds not only for pretrial preparation, but also for the services of the expert during jury selection. The trial court denied the application, ruling that the services of such an expert were not reasonably necessary to the preparation of the defense or to provide a full and fair defense.

Section 987.9 commits to the sound discretion of the trial court the determination of the reasonableness of an application for funds for ancillary services. Although a high standard must be applied to such discretionary decisions in capital cases (see *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430-431 [180 Cal.Rptr. 489, 640 P.2d 108]), there was no abuse of discretion in the trial court's ruling. Counsel was an experienced attorney who had represented defendant during the first trial. The assumption underlying the *Hovey* procedure is that the untoward effects of death qualification voir dire will be minimized. (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 80-81.) Defendant did not demonstrate how lack of experience in conducting voir dire under the *Hovey* procedure was relevant to his ability to identify prospective jurors who were qualified or were subject to excuse for cause.

None of the other factors supporting the request for ancillary funds establishes a basis for concluding that such funds were "reasonably

---

[8] We need not decide here whether there must be reason to believe that the circumstance in which a juror would consider imposition of the death penalty may be present in the case to be tried before him. (See *People* v. *Fields, supra,* 35 Cal.3d 329, 357, fn. 12.)

necessary." The availability of the expert and other economies of counsel are not relevant to that question. Nothing about the charges in this case so distinguishes it from other capital cases or noncapital cases in which sexual assaults are charged as to compel a conclusion that selection of impartial jurors would be unusually difficult. Denial of the request was not an abuse of discretion.

### III.

### GUILT PHASE ISSUES

A. *Admission of Defendant's Confessions.*

During an interrogation on October 3, 1978, in North Las Vegas, Nevada, defendant confessed that he had raped Kiz L. On November 8, 1978, he confessed that he had kidnapped, raped, and murdered Cheryl G. and a girl who was later identified as Adele C. We reversed the prior convictions because the record of the first trial indicated that those confessions were made while defendant was in custody in response to interrogations initiated by police officers after defendant had invoked his right to remain silent and to counsel. We held that California law determined the admissibility of defendant's confessions, and that the confessions were inadmissible under the California privilege against self-incrimination (Cal. Const., art. I, § 15) as construed in *People* v. *Pettingill, supra,* 21 Cal.3d 231. (See *People* v. *Mattson, supra,* 37 Cal.3d at pp. 88-91.)

At the request of defendant we have taken judicial notice of the record of the first trial to ascertain the nature of the procedure by which he sought to exclude his confessions. That record reflects a "Notice of Motion to Suppress the Evidence De Novo 1538.5 Penal Code" filed on November 7, 1979. In that motion defendant sought to suppress all of the statements, admissions, and confessions he had made in connection with the offenses charged in this matter on grounds that promises had been made to induce him to confess; that the interrogating officers knew he was represented by counsel but neither notified counsel nor sought permission from counsel appointed in the Nevada proceeding; and that after he had asserted his right to counsel during questioning by North Las Vegas, Nevada Detective Pat Dingle, Detective Reed, a California officer, had participated in interrogations leading to his confessions. This, he argued, violated his rights under California law as declared in *People* v. *Pettingill, supra,* 21 Cal.3d 231, and *People* v. *Fioritto, supra,* 68 Cal.2d 714.

In his motion defendant also sought to suppress "items found in automobile," claiming that the search of his automobile was unlawful because it

was not the result of a free and voluntary consent to search, his consent having been given after he had asserted his right to counsel. He argued that the consent was obtained in violation of his Sixth Amendment right to counsel, was made in submission to authority, and was "tainted" by the statements he alleged had been unlawfully obtained.

At the December 11, 1979, hearing on the motion defendant was permitted to expand the scope of the motion to include suppression of evidence regarding observations of the body of Adele C. The trial court stated that the effort to suppress the confessions should have been raised in a motion under Evidence Code section 402, but the People stipulated that the matter be heard at that time. The court then ruled that defendant would be permitted to litigate the admissibility of his statements in the hearing on the section 1538.5 motion.

1. *Propriety of Relitigation.*

The People were permitted to relitigate the admissibility of the confessions at the second trial, and introduced evidence, which had not been presented at the first trial, that the defendant initiated the interviews at which he confessed. The court overruled defendant's objection that the issue could not be relitigated, and that no new evidence on the issue could be considered. The confessions were admitted.

Defendant now claims that the trial court erred in permitting relitigation of the issue; that equitable estoppel principles preclude relitigation based on facts that are inconsistent and irreconcilable with facts established in the initial hearing; and that due process and presumed prejudice preclude relitigation based on new facts after a substantial delay.

We find no merit in these claims. ■ A reversal of a judgment without directions is an order for a new trial. (§ 1262.) "An unqualified reversal remands the cause for new trial and places the parties in the trial court in the same position as if the cause had never been tried." (*People* v. *Murphy* (1963) 59 Cal.2d 818, 833 [31 Cal.Rptr. 306, 382 P.2d 346].) "The granting of a new trial places the parties in the same position as if no trial had been had. . . ." (§ 1180.)

That status even permits amendment of the accusatory pleading (see *People* v. *Chadd* (1981) 28 Cal.3d 739, 758 [170 Cal.Rptr. 798, 621 P.2d 837]), as well as renewal and reconsideration of pretrial motions and objections to the admission of evidence. (See, e.g., *People* v. *Murphy, supra*, 59 Cal.2d at pp. 833-834.) Absent a statutory provision precluding relitigation, a stipulation by the parties, or an order by the court that prior rulings made

in the prior trial will be binding at the new trial, objections must be made to the admission of evidence (Evid. Code, § 353), and the court must consider the admissibility of that evidence at the time it is offered. (See *People v. Bell, supra,* 49 Cal.3d at pp. 520-521; *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475].) *In limine* rulings are not binding. (*People v. Williams* (1988) 44 Cal.3d 883, 912-913 [245 Cal.Rptr. 336, 751 P.2d 395].)[9]

Defendant's claim that our determination that his confession should have been excluded at the first trial constitutes the "law of the case" lacks merit. The law-of-the-case doctrine binds the trial court as to the law but controls the outcome only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based. (*People v. Carswell* (1959) 51 Cal.2d 602, 608 [335 P.2d 99]; *Erlin v. National Union Fire Ins. Co.* (1936) 7 Cal.2d 547, 549 [61 P.2d 756].) The law-of-the-case doctrine applied to this court's prior ruling only insofar as we held that California law governed the admissibility of the confessions. The trial court did not depart from that ruling in its determination, based on new evidence, that the confessions were admissible.

Defendant also argues that because his motion to exclude the confessions at the prior trial was part of a motion made pursuant to section 1538.5, relitigation of the admissibility of the confessions is statutorily barred. Section 1538.5 may preclude relitigation of the admissibility of evidence sought to be suppressed as the product of a search or seizure that violated the defendant's rights under the Fourth Amendment. (See *People v. Brooks* (1980) 26 Cal.3d 471 [162 Cal.Rptr. 177, 605 P.2d 1306].)[10] Here, however, defendant included Fifth and Sixth Amendment bases for exclusion of his confessions in a section 1538.5 motion.

Section 1538.5 is properly used only to exclude evidence obtained in violation of a defendant's state and/or federal (Fourth Amendment) right

---

[9] By contrast, when an appellate court has ruled on the admissibility of evidence prior to trial by opinion in a proceeding in mandate or prohibition, that ruling becomes the law of the case during the ensuing trial and appeal. (See *People v. Shuey* (1975) 13 Cal.3d 835, 845 [120 Cal.Rptr. 83, 533 P.2d 211].)

[10] Because we conclude that defendant's effort to suppress his confessions was not properly brought in a motion pursuant to section 1538.5, we need not decide whether the limitations on relitigation of the admissibility of evidence obtained as a result of an unreasonable search and seizure preclude relitigation prior to a retrial.

Prior to the adoption of section 1538.5 we did not question the right of the prosecution to reopen the question of admissibility of evidence challenged on the basis of an allegedly unlawful search and seizure. (See, e.g., *People v. Carswell, supra,* 51 Cal.2d 602, 608.)

to be free of unreasonable search and seizure.[11] Although the procedure may be used to exclude confessions that are the product of an unlawful search and seizure, and the question of whether a confession was unlawfully obtained may be decided by the court in order to rule on the admissibility of physical evidence that is discovered as a result of the confession, section 1538.5 may not be used to suppress admissions and confessions on grounds that they are the product of Fifth Amendment and/or Sixth Amendment violations. (*People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733-734 [125 Cal.Rptr. 798, 542 P.2d 1390].) *Zolnay* does not hold that when a *Miranda* violation (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) is found in a hearing on a section 1538.5 motion the confession may be suppressed as part of that motion. The statutory language would not support that rule since the evidence to be suppressed must have been "obtained as a result of a search and seizure."

 Here defendant sought to exclude his confessions and admissions solely on the ground that they were obtained in violation of his right against self-incrimination and his right to counsel. He did not assert that they were the product of an unlawful search and seizure. Although his self-incrimination and counsel claims had to be decided in order to rule on the part of his motion that sought to exclude evidence obtained in the search of his car, only that latter aspect of the motion was properly brought pursuant to section 1538.5. The trial court was clearly aware of the distinct bases for the attempt to exclude the confessions, however, having stated that the admissibility of the confessions should be litigated in a motion pursuant to Evidence Code section 402.[12]

Regardless whether defendant improperly sought to obtain a ruling on exclusion in the motion made pursuant to section 1538.5, however, the basis

---

[11] Section 1538.5 provides in pertinent part: "(a) A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on either of the following grounds:

"(1) The search or seizure without a warrant was unreasonable.

"(2) The search or seizure with a warrant was unreasonable because (i) the warrant is insufficient on its face; (ii) the property or evidence obtained is not that described in the warrant; (iii) there was not probable cause for the issuance of the warrant; (iv) the method of execution of the warrant violated federal or state constitutional standards; (v) there was any other violation of federal or state constitutional standards."

[12] Evidence Code section 402: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article.

"(b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests.

"(c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

on which the trial court found the confessions admissible was that there was neither a Fifth Amendment nor a Sixth Amendment violation. The court based its conclusion on a factual determination that defendant's initial refusal to speak to Detective Dingle was not an invocation of his rights, but a preference not to discuss the case while still in Ely.[13] While this court reached a different conclusion, we held exclusion was required because of the apparent violation of his right against self-incrimination and his right to counsel. (*People* v. *Mattson, supra*, 37 Cal.3d at pp. 89-92.) The effort to exclude the confessions was not properly a subject of a section 1538.5 motion and neither the trial court nor this court treated it as such.

Therefore, the hearing at the new trial was not relitigation of a section 1538.5 motion.[14] The trial judge at the second trial properly concluded that the prior hearing on the admissibility of the confessions had been a combined section 1538.5 and Evidence Code section 402 hearing. We agree.

■ We are not persuaded that relitigation should have been denied because of delay. Delays that are the product of the normal appellate process do not implicate due process concerns. The difficulty in locating witnesses, and the possibility of fading recollection, are no different with respect to the hearing on the admissibility of the confessions than with respect to the trial itself. As with claims of delay alleged to violate a defendant's right to speedy trial, because *normal* delays attributable to an appeal are unavoidable and are not purposeful, delay should be considered potentially prejudicial only when it occurs after issuance of the remittitur by the appellate court. (See *People* v. *Powell* (1974) 40 Cal.App.3d 107, 145 [115 Cal.Rptr. 109].)[15]

■ Since there was no bar to a new hearing on the admissibility of the confessions, and additional evidence on the question of who initiated the interviews was heard, the law-of-the-case doctrine did not compel the trial court to exclude defendant's confessions. ■ Except where insufficiency of the evidence to sustain a judgment of conviction was the basis for reversal, in which case double jeopardy considerations preclude relitigation (see *Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141];

---

[13] Detective Dingle had testified that when he arrived in Ely to pick defendant up he advised defendant of his *Miranda* rights (*Miranda* v. *Arizona, supra,* 384 U.S. 436) and asked defendant if he wanted to speak to him. Defendant did not state that he wanted to speak to an attorney, but said that he did not "want to talk at that time."

[14] The parties did agree that the pretrial ruling at the second trial was to be determinative of the admissibility of the statements and confessions, barring any unforeseen matter bearing on the issue arising at trial.

[15] Other than fading memories, defendant pointed only to his inability to locate two witnesses to the 1978 lineup. His investigator had not attempted to locate those witnesses until the day prior to the hearing on the admissibility of the confessions, however.

*People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468]), the law-of-the-case doctrine is inapplicable to the determination of questions of fact (*People* v. *Shuey, supra,* 13 Cal.3d at p. 842) decided on the basis of new or different evidence in a new trial following reversal on appeal. (*People* v. *Hamilton* (1969) 71 Cal.2d 176, 182 [77 Cal.Rptr. 785, 454 P.2d 681].)[16]

### 2. *Ruling on Admissibility.*

Defendant argues that his admissions and confessions were obtained in violation of his rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, and *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], as well as *People* v. *Fioritto, supra,* 68 Cal.2d 714, and *People* v. *Pettingill, supra,* 21 Cal.3d 231.

The only claim properly before us with regard to violation of defendant's privilege against self-incrimination is that based on article I, section 15 of the California Constitution. Defendant's motion and his argument at the hearings on that motion at the first and second trials relied only on the theory that under California law any interrogation, even by officers other than those with whom he had refused to discuss the Nevada charge and even about unrelated offenses, was impermissible once he had invoked his right to remain silent. He did not make the claims put forth on appeal that the manner in which his constitutional rights were explained failed to comply with *Miranda* or that the interrogation violated *Edwards* v. *Arizona, supra,* 451 U.S. 477, and *Oregon* v. *Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830], because his request to speak to Detective Dingle was not for the purpose of discussing the charged offenses.

A judgment will not be reversed on grounds that evidence has been erroneously admitted unless "there appears of record an objection to or a

---

[16] Neither constitutional nor "equitable" double jeopardy nor collateral estoppel considerations bar relitigation of the admissibility of defendant's confessions in this case. The former apply only to a prior determination of guilt or an issue of ultimate fact when a defendant has been acquitted or the evidence has been held to be insufficient to support his conviction. (*Arizona* v. *Rumsey* (1984) 467 U.S. 203 [81 L.Ed.2d 164, 104 S.Ct. 2305]; *Bullington* v. *Missouri* (1981) 451 U.S. 430 [68 L.Ed.2d 270, 101 S.Ct. 1852]; *Burks* v. *United States, supra,* 437 U.S. 1; *Ashe* v. *Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189].) That evidence inconsistent with that presented at the prior hearing may be or was presented goes to the credibility of the witness or witnesses, not to the admissibility of their testimony.

Defendant also makes a related double-jeopardy-based claim, asserting that because the evidence at his first trial was insufficient to support the judgment once the erroneously admitted confessions were excluded, he may not be retried at all. He concedes that no authority supports the claim which we reject as did the United States Supreme Court in *Lockhart* v. *Nelson* (1988) 488 U.S. 33 [102 L.Ed.2d 265, 109 S.Ct. 285]. The high court held there that mere trial court error in the admission of evidence does not preclude retrial if, with the erroneously admitted evidence, there was sufficient evidence to support the judgment of conviction.

motion to exclude or to strike the evidence that was timely made and so *stated as to make clear the specific ground of the objection or motion . . . ."* (Evid. Code, § 353, subd. (a). Italics added.) Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence. (*People* v. *Wright* (1989) 48 Cal.3d 168, 189 [255 Cal.Rptr. 853, 768 P.2d 72]; *People* v. *Williams, supra,* 44 Cal.3d 883, 906.) *Miranda*-based claims are governed by this rule. "The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal." (*People* v. *Milner* (1988) 45 Cal.3d 227, 236 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Defendant's motion also sought to exclude his confessions on grounds that they were not voluntarily made, having been induced by promises of psychiatric treatment, and that his right to counsel had been violated. The motion did not identify the constitutional basis or bases for those claims, but the authorities cited implied reliance on the due process guaranties of the federal and state Constitutions and on the Sixth Amendment.[17] These objections were sufficiently specific to preserve the issues for appeal.

Notwithstanding defendant's failure to identify in the trial court self-incrimination theories other than those based on alleged violation of *People* v. *Pettingill, supra,* 21 Cal.3d 231, and *People* v. *Fioritto, supra,* 68 Cal.2d 714, for exclusion of his confessions, we consider them here. We do so to forestall a later claim that trial counsel's failure to predicate his motion on those additional grounds reflects constitutionally inadequate representation, and because in the context of this case the new theories raise only issues of law and factual questions that this court decides independently. (See *People* v. *Carr* (1974) 43 Cal.App.3d 441, 444 [117 Cal.Rptr. 714].)[18]

---

[17] Defendant conceded that this court had rejected identical claims that interrogation without notice to counsel representing a defendant in other pending matters, but before formal charges have been filed in the subject of the interrogation, violated the right to counsel. His concession that *People* v. *Duck Wong* (1976) 18 Cal.3d 178 [133 Cal.Rptr. 511, 555 P.2d 297], and the Court of Appeal in *People* v. *Booker* (1977) 69 Cal.App.3d 654 [138 Cal.Rptr. 347], had held that interrogation in these circumstances was permissible, and his argument that those decisions were "bad law," implied a Sixth-Amendment-based claim.

[18] Although the inferences to be drawn from the evidence are disputed, there is no conflict in that evidence. This court not only may, but must, examine the evidence and independently determine whether a trial court properly found a confession to be admissible. (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74].)

Here we conclude, based solely on the evidence admitted at the hearing on defendant's motion to suppress, that defendant's claims lack merit. Our consideration of defendant's newly raised arguments in this case does not signal a willingness to do so in situations in which the

In support of his self-incrimination argument defendant claims variously with regard to several interviews by Nevada and California authorities that the advice he was given regarding his constitutional rights (his *Miranda* rights) was defective because he was not advised explicitly of his right to the presence of counsel *during* any questioning and to have counsel appointed for that purpose; that he was questioned after he had both invoked his right to silence and his right to counsel; and that the People failed to carry their burden of establishing that his purpose in initiating a conversation with the investigating officer was to discuss the offense or offenses of which he was suspected, rather than to discuss incidents of custody. (See *Oregon* v. *Bradshaw, supra*, 462 U.S. 1039, 1045-1046 [77 L.Ed.2d 405, 412-413].)

a. *Dingle Interview: September 26, 1978.*

Defendant argues that violations of his rights which preceded his statements to North Las Vegas Detective Pat Dingle necessarily tainted all of the admissions and confessions he made subsequently. Defendant claims that both *Miranda* violations and a violation of his right to counsel render his statements to Dingle inadmissible. Basic to defendant's claim that his confessions were obtained in violation of his right to counsel, is an argument that a deputy public defender who observed a lineup which preceded defendant's initial waiver of his rights was present to represent, and did represent, defendant.

i. *The evidence.*

The ruling of the trial court that defendant's statements to Dingle were not obtained in violation of his *Miranda* rights and were admissible was based on the following evidence.

Defendant was arrested at the home of his grandparents in Cherry Creek, Nevada, on September 22, 1978, by Archie Robison, the sheriff of White Pine (then Ely) County, Nevada. Defendant was arrested as a suspect in a kidnapping and sexual assault that had occurred two days earlier at the North Las Vegas Community College. After the arrest Sheriff Robison advised defendant of his right to remain silent, that anything he said could and would be used against him, that he had a right to consult with a lawyer and have one present while being questioned, and that a lawyer would be appointed for him before any questioning if he wished to have one. Defendant acknowledged that he understood his rights, but he was not questioned and said nothing about any offenses at that time. While being booked,

---

People were denied the opportunity to present possibly dispositive evidence on the newly raised issues.

however, defendant asked Sheriff Robison how he had been identified. When the sheriff mentioned tatoos on defendant's arms, defendant said: "I didn't think she saw those." No other statement was made.

Defendant was held in Ely, Nevada for the North Las Vegas police, and released to them on September 25, 1978. Detective Pat Dingle, a North Las Vegas police officer, and his partner, Detective King, took custody of defendant. Dingle advised defendant "that he had the right to remain silent. That anything he said could and would be used against him in a court of law. That he had the right to an attorney prior to being questioned, if he so desired. If he could not afford an attorney, one would be appointed to him [sic] by the courts, and he had a right to have an attorney present during any questioning." Defendant again acknowledged his understanding. When Dingle asked defendant if he wanted to talk without an attorney present, defendant replied, "no." No attempt was made to question him. Dingle and King drove defendant to North Las Vegas where he was booked into custody. No attempt was made to question him after booking on September 25.

On the morning of September 26, 1978, Detective Dennis Branch of the Huntington Beach Police Department telephoned Dingle. Branch was then investigating the Kiz L. kidnapping. He asked Dingle about the North Las Vegas kidnapping and requested copies of Dingle's report, as well as photographs and fingerprints of defendant. On that afternoon defendant appeared in a lineup. Dingle had notified the offices of both the district attorney and public defender of the lineup. He did so "as a matter of routine policy to see whether or not they wanted to send a representative down to the lineup." Deputy Public Defender Gubler attended and observed the lineup as did a deputy district attorney. The victim of the North Las Vegas kidnapping and assault identified defendant as her assailant at this lineup.

As the five participants in the lineup were being escorted by Dingle and King from the lineup room to the jail, defendant held back and said to Dingle, "I'd like to talk to you." Dingle responded that he had to take everybody to the jail and would see defendant "shortly." About 15 to 20 minutes later, after returning the lineup participants to the jail, and finishing his lineup business, Dingle asked the jailer to bring defendant to a holding area, from which Dingle escorted defendant to an interview room in the detective bureau. He then advised defendant of his rights again, telling him "that he had a right to remain silent. That anything he said could and would be used against him in a court of law. That he had the right to an attorney prior to being questioned, if he so desired, and if he couldn't afford an attorney, one would be appointed him [sic] by the courts at no cost to him." After defendant acknowledged his understanding of

those rights, Dingle asked defendant if he wished to waive them and speak to Dingle "now without an attorney." Defendant said that he did.

Defendant then asked Dingle where defendant's car was and was told it had been impounded. Dingle asked defendant about clothes found in the car. Defendant said they were his and asked Dingle if the Nevada kidnap/rape victim had identified him. Dingle told defendant that she had done so.

At the time of the interview, to Dingle's knowledge, no attorney had been appointed to represent defendant. Deputy Public Defender Gubler had not stated that he represented defendant or any of the other lineup participants. Dingle, Gubler, and the representative of the district attorney's office had signed a lineup form, however. Gubler had signed above a printed statement which read: "Signature of Public Defender or attorney for suspect." Had Gubler objected to the manner in which the lineup was being conducted, Dingle would have accommodated him. The purpose of having representatives of the district attorney and public defender present was to ensure that the lineup was legitimate and fair.

Gubler testified that before the lineup was conducted he spoke to the participants as a group, telling them that he was there as counsel for defendant, who was the suspect, and that they should all cooperate so that the lineup would be fair for defendant. He did not speak to defendant individually. Gubler was there as part of his duties as a public defender. He had not met defendant prior to the lineup, and did not know if his office had been appointed to represent defendant. He was never appointed to represent defendant and at the time of the lineup had not been appointed to represent any of the participants in the lineup. When the lineup was concluded Gubler left and had no further contact with defendant on that day. His function at the lineup was satisfied. The procedure of an attorney who observes a lineup is to sign the lineup form, which becomes part of the file for any attorney appointed to represent the defendant.

ii. *Miranda advice.*

■■■ In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, and its progeny, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. Although we must "independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained" (*People* v. *Boyer, supra,* 48 Cal.3d 247, 263), we may " 'give great weight to

the considered conclusions' of a lower court that has previously reviewed the same evidence. (See *Miller* v. *Fenton* (1985) 474 U.S. 104, 112 [88 L.Ed.2d 405, 412, 106 S.Ct. 445].)" (*People* v. *Jennings, supra*, 46 Cal.3d at p. 979.)

Because this offense occurred prior to the addition of section 28, subdivision (d), to article I of the California Constitution, the voluntariness of defendant's waiver of his rights must be established by proof beyond a reasonable doubt that he was aware of, and intelligently waived, his *Miranda* rights. (*People* v. *Howard* (1988) 44 Cal.3d 375, 394 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446]. Cf. *People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].)

■■■ Defendant claims that the advice given him by Dingle was not adequate to comply with the mandate of *Miranda* because it did not state that he had the right to have an attorney present during questioning. (See *Fare* v. *Michael C.* (1979) 442 U.S. 707, 717 [61 L.Ed.2d 197, 207, 99 S.Ct. 2560]; *Miranda* v. *Arizona, supra*, 384 U.S. at p. 473 [16 L.Ed.2d at p. 723].) As indicated above, however, defendant was given this advice when he was picked up by Dingle in Ely. Although it was not included in the restatement of his rights prior to the first North Las Vegas interview, it was implicit in the question asked by Dingle that immediately preceded defendant's waiver of his rights—whether he "wanted to waive the rights and speak to me now *without an attorney.*"

We have no doubt that the advice given defendant regarding his rights was adequate to make clear to him that his right to counsel encompassed the right to have counsel present during questioning. The *Miranda* advice is prophylactic (*Michigan* v. *Tucker* (1974) 417 U.S. 433, 446 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357]), and need not be given in a "precise formulation" or "talismanic incantation." (*California* v. *Prysock* (1981) 453 U.S. 355, 359 [69 L.Ed.2d 696, 701, 101 S.Ct. 2806].) Nothing in the manner in which his rights were explained to him suggested that defendant did not have a present right to counsel. Rather, he was expressly advised once, and implicitly advised immediately before he waived his rights, that he had a right to have counsel present during any interrogation.

iii. *Prior invocation of rights.*

■■■ Defendant also contends that the evidence does not support a conclusion that he initiated the first North Las Vegas interview with Dingle for the purpose of discussing any criminal offenses of which he was suspected, or a conclusion that he, rather than Dingle, brought up that subject

during the interview. We agree, of course, that having once invoked his *Miranda*-based right to counsel, any subsequent attempt to interrogate defendant was impermissible unless defendant initiated the interview. (*Edwards* v. *Arizona, supra,* 451 U.S. 477; *People* v. *Jennings, supra,* 46 Cal.3d at pp. 976-977; *People* v. *Mattson, supra,* 37 Cal.3d at p. 91; *People* v. *Pettingill, supra,* 21 Cal.3d 231; *People* v. *Fioritto, supra,* 68 Cal.2d 714.)

▬ "Once the suspect has 'expressed his desire to deal with the police only through counsel, [he] is *not subject to further interrogation by the authorities* until counsel has been made available to him, *unless the accused himself* initiates further communication, exchanges, or conversations with the police.' [Citation.] Once the *Miranda* right to counsel has been invoked, no valid waiver of the right to silence and counsel may be found absent the '*necessary fact* that the accused, not the police, reopened the dialogue with the authorities.'" (*People* v. *Boyer, supra,* 48 Cal.3d 247, 273.)

▬ The evidence that defendant initiated the September 26, 1978, interview with Dingle is undisputed. Dingle's testimony was corroborated by Detective King, who observed defendant contact Dingle and ask to speak with him. Although defendant attempted to impeach Dingle by suggesting that his testimony was recently fabricated, the trial judge stated that he found the testimony of the police officers, particularly that of Detectives Dingle and King, that defendant had initiated the conversations that followed the September 26, 1978, lineup to be credible, and that from all the evidence he found that defendant knowingly and intelligently waived his constitutional rights and discussed the matter with Dingle. He also believed "beyond a reasonable doubt" the evidence presented regarding the confessions made on November 8, 1978.

Having reviewed the testimony of both Dingle and King we, too, are satisfied beyond a reasonable doubt that defendant initiated the interview.

Defendant also argues, however, that the People bear the burden of establishing that he initiated the interview with Dingle for the purpose of discussing the charged offenses rather than conditions of custody or other routine matters. Defendant reasons that Dingle was obliged to confirm that defendant's purpose was not to discuss routine matters before bringing up the offenses. His reliance on *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, and *Edwards* v. *Arizona, supra,* 451 U.S. 477, for these propositions is misplaced.

In *Edwards* the Supreme Court established another "prophylactic rule" (*Michigan* v. *Harvey* (1990) 494 U.S. __, __ [108 L.Ed.2d 293, 302, 110 S.Ct. 1176]), holding that an accused who has invoked his *Miranda*-based

right to counsel may not be interrogated unless "the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 485 [68 L.Ed.2d at p. 386].) The court recognized that often when an accused initiates a meeting with police after having invoked his rights, the ensuing conversation is not "one-sided" and it is likely that there will be interrogation. "In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." (451 U.S. at p. 486, fn. 9 [68 L.Ed.2d at p. 387].)

The court again addressed the question in *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039. In that case the accused had been arrested for furnishing liquor to a minor whose body had been found in the minor's wrecked automobile. After the arresting officer suggested that the accused might actually have been the driver, he had invoked his *Miranda*-based right to counsel and the interview had been terminated. Later, during or just before transfer to the county jail, the accused asked a police officer what was going to happen to him. The officer responded by reminding the accused that he did not have to speak with the officer, that he had requested an attorney, and that the officer did not want the accused to speak to him because the accused had requested counsel and it "has to be at your own free will." The officer told the accused where he was being taken and the offense with which he was to be charged, and also stated that the accused could help himself by taking a polygraph examination. The accused said he would take the examination, and after waiving his *Miranda* rights on the next day, did so. When told by the examiner that the examiner did not believe the accused was truthful, the accused confessed that he had been the driver. The state court held the confession was inadmissible under *Edwards* v. *Arizona, supra,* 451 U.S. 477, reasoning that the inquiry about what was to happen to him was not a waiver of the accused's rights.

A plurality opinion by Justice Rehnquist, in which Chief Justice Burger, and Justices White and O'Connor concurred, reasoned that the requirement that the accused initiate communication with police was a prophylactic rule intended to prevent badgering of a suspect who has invoked his rights. When the accused initiates further dialogue and interrogation follows, the People have the burden of showing that "subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." (*Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, 1044 [77 L.Ed.2d at p. 412].)

The plurality acknowledged that some inquiries by an accused "such as a request for a drink of water or a request to use a telephone" are too routine to reflect a desire to open up general conversation relating directly or indirectly to the charges. "Such inquiries or statements . . . will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards.*" (*Oregon* v. *Bradshaw, supra,* 462 U.S. at p. 1045 [77 L.Ed.2d at p. 412].) In the case before it, however, the plurality concluded the inquiry "was not merely a necessary inquiry arising out of the incidents of the custodial relationship" and could have been reasonably understood by the officer as relating to the investigation. Therefore, the officer did not violate the *Edwards* rule when he spoke with the accused about the offense. (*Id.* at p. 1046.) After resolving that question, the plurality turned to whether a valid waiver of the accused's rights to silence and counsel occurred, and agreed with the conclusion of the state court that the accused's statements to the polygraph examiner were the voluntary product of a knowing waiver. (*Ibid.*)

Justice Powell concurred separately with the plurality in *Oregon* v. *Bradshaw, supra.* He did not agree, however, that the two-step analysis undertaken by the plurality was either required by *Edwards* or appropriate since incarcerated persons accused of crimes engage in numerous conversations with officers that rarely lend themselves to an analysis of who spoke first about the offenses. The crucial question, in the opinion of Justice Powell, is whether under the totality of circumstances the accused made a knowing and intelligent waiver of his right to counsel. (*Oregon* v. *Bradshaw, supra,* 462 U.S. at pp. 1047-1051 [77 L.Ed.2d at pp. 413-416].)

Applying either the approach of the plurality or that of Justice Powell in *Oregon* v. *Bradshaw, supra,*[19] we conclude that defendant's confessions were admissible. There was no indication in defendant's request to speak to Dingle that defendant wished to discuss only routine matters related to his incarceration. *Edwards* v. *Arizona, supra,* 451 U.S. 477, does not suggest that the prosecution bears the burden of establishing that an accused who has initiated a conversation after invoking his rights does not intend to discuss only routine matters. The court recognized that in some cases it is obvious that an inquiry by an accused relates only to routine matters, but absent such indications there are situations in which an officer may reasonably infer a willingness or desire to speak about an ongoing investigation. This was such a case since defendant asked about his car. He did not simply express concern about whether the car was in safekeeping. The location of the car was relevant to both the North Las Vegas offenses, and to those in

---

[19]The court now appears to have adopted the reasoning and approach of Justice Powell. (See *Michigan* v. *Harvey, supra,* 494 U.S. __, __ [108 L.Ed.2d 293, 302].)

California. It held highly incriminating evidence. Dingle could reasonably believe, therefore, that defendant was interested in discussing the investigation.

Under either the two-step analysis of the plurality in *Oregon* v. *Bradshaw, supra,* or the totality-of-the-circumstances approach of Justice Powell, our next inquiry is whether defendant made a knowing, intelligent, and voluntary waiver of his rights.[20] Here, defendant not only initiated the contact, he expressly waived his rights before the interview commenced and did so after having additional time to reflect between asking for the interview and being taken from his cell to the interview room. There was no police badgering and no apparent pressure. Indeed, it appears that Dingle was being overly cautious in readvising defendant of his rights and obtaining a waiver before any conversation took place. Defendant had already acknowledged his understanding of his rights and had unequivocally exercised them. We see no basis on which to conclude that defendant would then waive them involuntarily if his only reason for asking to speak with Dingle was, as he now suggests, to inquire about the whereabouts of his car.[21]

We conclude, as did the trial court, that defendant's waiver was voluntary.[22]

---

[20] Although the United States Supreme Court may limit this inquiry to whether there was a valid waiver of the *Miranda*-based right to counsel, we consider here whether defendant waived both his right to counsel and his right to silence. (See *People* v. *Boyer, supra,* 48 Cal.3d 247, 273, fn. 14.)

[21] At the hearing on the admissibility of defendant's statements and confessions, the court first considered whether Dingle would be permitted to testify about the interview with defendant. His testimony was necessary because of its relevance to the admissibility of defendant's statements and confessions made in subsequent interviews, and because defendant made incriminating statements about the Kiz L. offenses during this initial interview.

Defendant attributes to Dingle a lack of recall as to whether defendant had discussed concern over being housed with Black inmates and as to whether defendant brought up the subject of the offense. Dingle testified that at the outset of the interview defendant asked where his car was, and Dingle told him that it had been impounded. A conversation about the investigation followed, and at some point Dingle asked defendant specific questions.

Defendant suggests that the People bear the burden of proving that the defendant directed the conversation to the offenses. This is not the crucial question under *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, however. The issue is whether the circumstances surrounding a defendant's initiation of contact with the police are such as to establish a valid waiver of the right to counsel and the right to silence. If a valid waiver has been expressly made prior to any interrogation, the identity of the party who brings up the discussion of the offenses is irrelevant.

[22] Nothing in *Edwards* v. *Arizona, supra,* 451 U.S. 477, or *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, supports defendant's argument that Dingle had an obligation, or that he intentionally avoided an obligation, to preface any conversation with an inquiry to clarify the scope of defendant's desire to communicate. Since he could reasonably infer that defendant wished to speak with him about the investigation, and had again advised defendant of his *Miranda*

iv. *Psychological coercion.*

In addition to the argument rejected above that his statements to Detective Dingle were obtained in violation of his *Miranda* and/or *Fioritto-Pettingill* rights and therefore tainted all subsequent statements and confessions, defendant claims that psychological coercion and inducements, coupled with his psychological vulnerability, rendered his waivers of rights involuntary. .

In support of this claim defendant relies on the evidence above, and on Dingle's testimony that defendant told Dingle that he needed psychiatric attention and wanted help for his deviant sexual behavior. Dingle made no offer or promises to obtain counseling for defendant, however. The record reflects only that Dingle agreed that psychiatric counseling could be beneficial and, when defendant asked to see a psychiatrist, Dingle did arrange for that. No evidence supports defendant's claim that Dingle offered to facilitate transfer to California custody or deceived defendant regarding his interest in learning about the California crimes.

The evidence on which defendant relies does not indicate that psychological coercion was used in eliciting defendant's admissions and confessions. Nothing in the record suggests that threats, promises of leniency, or any inducements by Dingle, or by the officers who subsequently interrogated defendant, were the motivating cause of his admissions and confessions.[23] (Cf. *People* v. *Hogan* (1982) 31 Cal.3d 815, 838-839 [183 Cal.Rptr. 817, 647 P.2d 93].)

The trial court did not err, therefore, in ruling that the testimony of Detective Dingle regarding defendant's statements at the September 26, 1978, interview was admissible. A fortiori, the subsequent admissions and confessions were not inadmissible as the product of this interview and the

---

rights and made sure that defendant waived them before the interview commenced, his obligation was met.

[23] Detective Reed, who first interviewed defendant on November 8, 1978, testified that no promises were made to defendant. Defendant stated that he believed he may have committed additional crimes that he had blocked out of his memory. He suggested to Reed that drugs might help him recall details of his crime, and when Reed said he could not assist in that way, it was suggested that a psychiatrist might be able to help. A psychiatric interview was arranged, but not in exchange for defendant's willingness to confess. Rather, the psychiatric consultation was in response to defendant's suggestion that this might help him recall more information.

The only promise made by Reed was a promise to listen to defendant and explain what defendant said about his drug problem and need for help to proper authorities, doctors, or whoever might be interested. Reed believed that defendant found it easier to talk about his crimes and that it lessened his feelings of guilt when he discussed himself as a person who was drug crazed and in need of help.

statements made during it. (Cf. *People* v. *Braeseke* (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Braeseke* (1979) 25 Cal.3d 691, 703-704 [159 Cal.Rptr. 684, 602 P.2d 384].)

The statements made during and subsequent to the September 26, 1978, interview were also admissible. No coercion, psychological or otherwise, is reflected by the circumstances in which they were made.

After defendant told Dingle that the clothes in the car were his,[24] and Dingle had told defendant that the North Las Vegas victim had identified defendant, Dingle and defendant discussed those offenses. Defendant explained the kidnap and rape in his own words. Dingle then told defendant that there had been a similar case in Huntington Beach. Defendant replied: "Yes, you know, I know," and told Dingle in general, "vague," terms about the Huntington Beach case that he first claimed to have heard about on television. Later in the conversation defendant gave Dingle details about both the North Las Vegas and the Huntington Beach offenses. The interview lasted no more than four hours, with a break for dinner. At the end of the interview, defendant asked Dingle when he would see him again. Dingle told defendant that he would see him the following day.

On September 27, 1978, Dingle again advised defendant of his rights. Defendant acknowledged his understanding and expressed his willingness to talk to Dingle without an attorney present. They went into more detail about both cases. Between that interview and shortly after noon on Friday, September 29, 1978, defendant made a full confession as to each case. Before doing so he had again been advised of his rights, waived them, and in response to the question whether he was willing to talk without an attorney present, replied, "Sure." The confessions were tape-recorded, a transcript was prepared, and defendant was given an opportunity to review the typed transcript that he signed on each page. The statement itself contained a "rights admonition" that petitioner acknowledged reading and understanding. During this period Dingle had been in contact with Detective Branch of the Huntington Beach Police Department and had exchanged information about defendant and the Kiz L. case.

Dingle testified that the several interviews with defendant were conducted in a relaxed atmosphere and were conversational rather than an interrogation.

---

[24] Dingle returned to the subject again, noting that many items of women's clothing were in the car. Prompted by defendant, Dingle then telephoned defendant's mother who stated that defendant was a transvestite, and since early childhood had stolen and kept women's clothes, primarily underwear.

When counsel was appointed for defendant, Dingle advised counsel of the development of the two cases, and that the California case was branching out into other areas. This occurred during the first week in October 1978. Dingle did not recall any objection by defendant's counsel to the interviews with defendant and he continued to interview defendant four or five times a week during the month of October.

b. *Reed Interview: November 8, 1978.*

Dingle had been contacted early in November 1978 by Detective Reed of the Los Angeles County Sheriff's homicide division. Although Dingle had suspected that defendant might have been involved in one or more murders, until this time he was unaware of any actual murder investigation in which defendant was or might be implicated. On November 5, 1978, Reed filed complaints in the Whittier Municipal Court charging defendant with the Cheryl G. and Kiz L. offenses. Reed came to North Las Vegas on November 7, 1978, and interviewed defendant for the first time on November 8, 1978. Dingle was present and again advised defendant of his rights. Before the interview Reed repeated the admonitions and obtained waivers. He expressly advised defendant of his right to counsel and asked defendant if he wished to have counsel present during the interview. Defendant said he would talk to Reed and did not wish counsel. Reed had identified himself to defendant, showed him his credentials, and told defendant he was investigating California crimes, and specified the crimes.

Reed told defendant he was investigating a case involving a girl from the Santa Fe Springs area and asked defendant if he knew anything about it. Defendant replied that he knew the girl was dead. During this interview, after Reed told defendant that defendant and his automobile had been identified by a custodian at the Santa Fe Springs High School, defendant admitted the kidnapping and sexual assault on Cheryl G. His statement was taped, transcribed, and in typewritten form signed by defendant. This statement also bore advice of rights and waiver signed by defendant.

Defendant then volunteered: "I'll give you one you don't know about." He then described the murder of another woman, gave directions to the location of the body, and told Reed about the paper in his car on which a map of the location would be found. Defendant gave consent to search the car for this paper. This victim was later identified as Adele C. Defendant's statement about this offense was also recorded, transcribed, and signed in the same manner as the earlier statements.

3. *Intentional Interference With Right to Counsel.*

■■■■ Defendant's final challenge to the admission of his admissions and confessions is premised on assertions that: (1) defendant was represented by

counsel from the time that Deputy Public Defender Gubler appeared to observe the lineup in which defendant was a participant on September 25, 1978; (2) Dingle failed to advise Deputy Public Defender Ahlswede, who was formally appointed to represent defendant in the North Las Vegas matter on October 3, 1978, that Dingle would question defendant about possible capital charges; and (3) the officers who interrogated defendant on or after October 3, 1978, failed to notify Ahlswede before questioning defendant.

The People argue that no interference with defendant's right to counsel on the California charges could have occurred in Nevada because formal charges had not been filed at the time of the Nevada interviews. As a result, the People argue, no right to counsel had yet arisen.

a. *The Evidence.*

Defendant first appeared before a magistrate of the North Las Vegas Justice Court on September 26, 1978, as an arrestee. He and other arrestees were advised of the arrest charges, of their right to counsel, and of their right to appointment of counsel. No formal charges had been filed at that time and counsel was not appointed. A complaint was filed on September 28, 1978. Ahlswede was present in the courtroom and saw defendant there on that date, but had no actual contact with him until October 3, 1978, shortly before his appointment, when he interviewed defendant regarding his financial circumstances. Ahlswede testified that when Dingle contacted him, within two weeks after that date, he indicated to Dingle that it was all right for Dingle to speak to defendant. Dingle told Ahlswede that defendant had made admissions regarding the Huntington Beach matter. Ahlswede was not aware of any other investigations, and did not recall if he had been in North Las Vegas on November 8, 1978. Ahlswede did not recall when he first saw Detective Reed, but was advised at the time he saw Reed that a homicide investigation was underway.

Ahlswede testified, after defendant waived the attorney-client privilege, that both before and after speaking with Dingle he discussed with defendant the advisability of further interviews with Dingle. Ahlswede and defendant realized that defendant faced service of substantial time in Nevada for a serious crime. At that time defendant was eager to be returned to California, and Ahlswede's decision to advise defendant to cooperate with Dingle was based on his opinion that this would further defendant's wishes to be returned to California. Had Ahlswede known that Dingle was investigating possible murder charges he would not have suggested cooperation.

Reed attempted unsuccessfully to contact Ahlswede prior to the November 8, 1978, interview. A message was left at Ahlswede's office, and a second

unsuccessful telephone call was made in attempt to contact Ahlswede before the interview commenced.

b. *Right to Counsel.*

■ At the time of the several interviews in Nevada defendant had voluntarily and intelligently waived his Fifth Amendment and Sixth Amendment right to counsel during interrogation. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Moran v. Burbine* (1986) 475 U.S. 412, 422-423 [89 L.Ed.2d 410, 422, 106 S.Ct. 1135]. Cf. *Arizona* v. *Roberson* (1988) 486 U.S. 675 [100 L.Ed.2d 704, 108 S.Ct. 2093].)

■ As to the Cheryl G. and Adele C. charges, since defendant had not yet been charged at the time of the initial interviews, he had no Sixth Amendment right to counsel. (*Moran* v. *Burbine, supra*, 475 U.S. at p. 428 [89 L.Ed.2d at pp. 425-426].) His Sixth Amendment rights arose with respect to the Cheryl G. charges on November 5, 1978, but since he had not been arraigned on those charges when Detective Reed interviewed him, counsel had not been appointed to represent him in that matter. He therefore had no existing attorney-client relationship with any attorney, appointed or retained, whose representation included defense of the California charges about which he was questioned in Nevada.

Defendant appears to rely on reasoning that the Nevada and California officers interfered with his right to counsel by failing to respect an existing attorney-client relationship in the Nevada prosecution by notifying his Nevada counsel of the plan to interview him. Insofar as defendant's argument is directed to questioning prior to November 5, 1978, and questioning regarding the Adele C. offenses, it lacks merit. A similar claim was rejected by the high court in *Moran* v. *Burbine, supra*, 475 U.S. 412, in which the court held that prior to the initiation of adversary judicial proceedings, interrogation of a defendant who has validly waived his Fifth Amendment rights is not precluded by the Sixth Amendment even when counsel does, or desires to, represent the defendant.[25]

---

[25] Defendant bases his argument on an assumption that Deputy Public Defender Gubler was present at the September 1978 lineup "representing" defendant. Although the existence of such a relationship is not controlling, we reject that assumption. The evidence established that representatives of the public defender's office routinely observe lineups for the purpose of suggesting changes in the procedure if any aspect appears to them to be unfair, and to record their observations for the benefit of counsel who may represent any of the lineup participants

The court held that the existence of an attorney-client relationship prior to the filing of formal charges does not trigger Sixth Amendment protections. "The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any 'criminal prosecutio[n],' U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the ' "prosecutorial forces of organized society." ' [Citation.] By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. . . . [¶] Indeed, in *Maine* v. *Moulton* [(1985) 474 U.S. 159 (88 L.Ed.2d 481, 106 S.Ct. 477)], decided this Term, the Court again confirmed that looking to the initiation of adversary judicial proceedings, far from being mere formalism, is fundamental to the proper application of the Sixth Amendment right to counsel." (*Moran* v. *Burbine, supra,* 475 U.S. at pp. 430-431 [89 L.Ed.2d at p. 427].)

This has long been the rule in California. In *People* v. *Duck Wong, supra,* 18 Cal.3d 178, we recognized the "compelling policy considerations" which weighed against an extension of the rule that statements elicited after indictment of a defendant in the absence of retained counsel are inadmissible. (See *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *People* v. *Isby* (1968) 267 Cal.App.2d 484 [73 Cal.Rptr. 294].) We observed that "[f]ollowing the commission of a possible crime, it is essential that the police not be unduly hampered in their investigation. Under defendant's propos[al] . . . however, interrogation of suspects could be delayed indefinitely while the officers attempted to locate the suspect's counsel, notify him of the proposed interview, and either obtain his consent thereto or permit his participation therein. We find no convincing reasons why such a cumbersome procedure is necessary to protect a suspect's constitutional rights." (*People* v. *Duck Wong, supra,* 18 Cal.3d at p. 187.)

Subsequent to *Duck Wong,* we held in *People* v. *Houston* (1986) 42 Cal.3d 595 [230 Cal.Rptr. 141, 724 P.2d 1166], that a defendant's right to counsel under article I, section 15 of the California Constitution was violated when interrogating officers failed to advise the defendant that counsel retained by others to represent him in the matter about which he was being questioned was at the station house to assist him. The *Houston* rule was quite narrow, however, and was limited to the facts of that case—"whether or not a suspect in custody has previously waived his rights to silence and counsel, the police may not deny him the opportunity, before questioning begins or

who is subsequently charged with a criminal offense. Gubler was not appointed to represent defendant, had no individual contact with defendant, and undertook no responsibility to advise, counsel, or otherwise represent defendant.

resumes, to meet with his retained or appointed *counsel who has taken diligent steps to come to his aid.*" (42 Cal.3d 595, 610. Italics added.)

Defendant had neither retained nor appointed counsel in the California matters, and his appointed Nevada counsel had taken no steps to assist defendant with regard to those matters.

Defendant nonetheless argues that his Sixth Amendment right to counsel in the Cheryl G. matter arose when the complaint was filed in California on November 5, 1978, at which time defendant was represented in the Nevada case by Deputy Public Defender Ahlswede. After that date defendant was interrogated by, and made incriminating statements about, the Cheryl G. offense to Detective Reed.[26]

No violation of a defendant's Sixth Amendment right to counsel occurs, however, as a result of a failure to notify counsel who represents a defendant in a prosecution for a separate offense of the intent to interview the defendant as a suspect in an unrelated criminal investigation when the defendant has waived his right to have counsel present during the interview. (*People* v. *Duren* (1973) 9 Cal.3d 218, 243 [107 Cal.Rptr. 157, 507 P.2d 1365].)

We need not decide whether, in the absence of a waiver, the investigating officers must inquire if the appointed attorney will also represent the defendant during interrogation about an unrelated offense. We are not persuaded by defendant's argument that this case is taken out of these rules because Detective Dingle engaged in a deceptive conduct, and did not advise defendant during the interviews of Detective Reed's interest in offenses other than the Kiz L. matter. Even before Dingle became aware of defendant's involvement in any specific California offense, he believed that defendant had committed crimes other than those crimes committed in North Las Vegas. He intended to obtain information about any crimes in which defendant was implicated. The evidence simply fails to support defendant's suggestion that Dingle engaged in deceptive practices when he interviewed defendant, however. The manner in which the interviews were conducted reflects none of the coercive elements that might violate a defendant's Fifth Amendment, Sixth Amendment, or due process rights. (Cf. *People* v. *Hogan, supra,* 31 Cal.3d 815; *People* v. *Azure* (1986) 178 Cal.App.3d 591 [224 Cal.Rptr. 158].)

The trial court did not err in admitting defendant's statements and confessions to Dingle and Reed.

---

[26]The uncontradicted evidence establishes that Reed twice attempted to contact Ahlswede prior to his interviews with defendant.

## B. *Rulings on Defense Objections.*

Defendant argues that the trial court erred in ruling on various objections to admission of other items of evidence, instructions, and prosecutorial argument. He claims that these errors, individually and cumulatively, undermined his defense strategy of attempting to cast doubt on the reliability of his confessions to the Cheryl G. and Adele C. offenses. In order to do so he sought to demonstrate that he had falsely confessed to another crime, the murder of Deanna M. on July 20, 1978, in Hemet, California. In support of that defense, defendant relied principally on a time card that suggested he was at his place of employment in suburban Los Angeles at the time of the Hemet killing, and testimony of persons with whom he was employed regarding the manner in which time cards were managed and defendant's normal work practices.

### 1. *Police Opinion Testimony.*

■■■ Defendant contends that the court erred in admitting the testimony of a Hemet police officer that notwithstanding the apparent alibi, defendant continued to be a suspect of the still unsolved Deanna M. murder. This testimony, he argues, was opinion testimony regarding his guilt of that offense. Defendant contends now that the testimony was hearsay and referred to matters outside the record. The trial objection, however, was that the evidence was irrelevant.

The evidence to which defendant objected was offered to rebut evidence that his confession to the Deanna M. murder was a fabrication. The People had offered evidence of defendant's knowledge of details about the victim, the means of death, and the location of the body, tending to confirm his guilt of that offense and thus the veracity of his confession. The testimony in question was relevant, not as an opinion that defendant was guilty, but to establish that, in light of the other evidence of guilt, defendant's alibi was insufficient to cause an experienced police investigator to rule defendant out as a suspect in the Deanna M. homicide.

The trial court did not err in overruling defendant's relevance objection to admission of this evidence.

### 2. *Photographs of Deanna M.*

■■■ The trial court overruled defendant's objection to admission of photographs that reflected the position of this victim's body when found, and the tanning pattern on the victim. The court expressly found that the probative value of the photographs outweighed their prejudicial impact.

(Evid. Code, § 352; *People* v. *Thompson* (1988) 45 Cal.3d 86, 104 [246 Cal.Rptr. 245, 753 P.2d 37].) The court did not err. The photographs were not unduly gruesome, and were highly relevant since they tended to confirm the veracity of defendant's confession by demonstrating matters that only the actual killer could have known.

Defendant's argument that the photographs were merely cumulative lacks merit. Although witnesses testified regarding these matters, the testimony reflected only the witnesses' opinion that details given by defendant in his statements to the Hemet officers closely matched the actual conditions of the body. In these circumstances the photographs were the best evidence of those conditions. Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value. (*People* v. *Carter* (1957) 48 Cal.2d 737, 748-749 [312 P.2d 665].)

3. *Instructions.*

a. *Consciousness of Guilt.*

Defendant claims next that the trial court erred in instructing the jury in the language of CALJIC No. 2.03.[27] He argues that the instruction permitted the jury to consider his denials of the Deanna M. homicide as consciousness of guilt of the offenses for which he was on trial by reasoning that his confession to the Deanna M. homicide was relevant to his guilt of those charges.

We perceive no error. The language of the instruction is clear. It restricts consideration of prior statements as reflecting consciousness of guilt to false statements about the charge for which the defendant is being tried. Defendant's denials of the Deanna M. homicide were not statements "concerning the charge on which [defendant was] being tried." Moreover, the jury was expressly instructed regarding the relevance of a conclusion that defendant's Deanna M. confession was false.[28] In the context in which the instruction was given we cannot accept defendant's speculation that the jury might

---

[27] "If you find that before this trial the defendant made wilfully false or deliberately misleading statements *concerning the charge on which he is now being tried,* you may consider such statements as tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination." (Italics added.)

[28] The jury was instructed that "then you must determine what effect, if any, your findings have on the probative value of the confessions introduced to support the charges in this case.

"If, from all the evidence you have a reasonable doubt of the defendant's guilt of any charge then you must find the defendant not guilty of that charge."

have misunderstood the limited relevance of a conclusion that he had falsely denied killing Deanna M.

Defendant also claims that it was error to give CALJIC No. 2.03. The basis upon which the instruction was requested by the People was defendant's initial denial that he had committed the Cheryl G. offenses. As defendant observes, since he later gave a full confession to those crimes the probative value of, and inference of consciousness of, guilt from the initial denial was tenuous. Nonetheless, even if erroneously given, the instruction was not prejudicial. Defendant's confession and the other evidence connecting him to those offenses were overwhelming. It is not reasonably probable that a different verdict would have been reached absent the error, if it was error. The impact of an inference of consciousness of guilt could not have resulted in a miscarriage of justice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

b. *Duty to Give Sua Sponte Admonition.*

■■■ Defendant suggests that the prosecutor "appears" to have improperly implied in his closing argument that guilt should be inferred from the defendant's pattern of conduct. The apparent misconduct is identified as a statement that "[t]he defense attorney talks about that there seems to be a lot of similarities between some of the statements that are obtained from the defendant. Of course there are. Because Michael Dee Mattson kidnaps, rapes, and kills people in a similar fashion."

This "improper argument," defendant argues, triggered a duty on the part of the court to give a sua sponte instruction to the jury that the evidence regarding each offense must be separately considered.

There was no misconduct. The argument was responsive to defendant's argument that the confessions were similar because they were fabricated. The prosecutor did no more than point out an alternative reason for the similarities, a reason supported by the evidence. Moreover, the numerous similarities, or common marks, in the manner in which the offenses were committed could be considered by the jury as evidence of the identity of the killer. (*People* v. *Bean* (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996].) Most importantly, however, defendant did not object to the argument. He attempts to circumvent the rule that an objection to assertedly improper argument must be made, and the court afforded the opportunity to admonish the jury, if a misconduct claim is to be preserved for appeal. (*People* v. *Bell, supra,* 49 Cal.3d at p. 535.) Since an admonition could have cured any misunderstanding of the import of the evidence, the failure to object constitutes a waiver of the issue on appeal.

c. *Jury Agreement: CALJIC No. 17.01.*

■ Defendant argues that the trial court's failure to instruct the jury that it had to agree on a single act to find that the murder of Cheryl G. was perpetrated during the commission or attempted commission of a lewd and lascivious act requires reversal of the conviction of the murder of Cheryl G.

The jury necessarily agreed on a single act, however, when it found, under proper instructions, that the murder was committed during the commission of rape.[29] It is impossible to commit an act of rape on a child under 14 without simultaneously violating section 288. (*People* v. *Cogar* (1962) 202 Cal.App.2d 509, 512 [21 Cal.Rptr. 27]; *People* v. *Stampher* (1959) 168 Cal.App.2d 579, 580-581 [336 P.2d 207].) Assuming therefore that the instruction was required (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971]; but see *id*. at p. 282; *People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516]), defendant suffered no prejudice as a result of the omission. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

4. *Corpus Delicti.*

Defendant sought by motions pursuant to sections 995 and 1118.1 to have all special circumstance allegations on both the Adele C. and Cheryl G. murder counts and the Adele C. murder charge itself dismissed, arguing that there was insufficient evidence independent of his confessions to support those charges. Because error in the denial of a motion pursuant to section 995 does not require reversal absent a showing of prejudice (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941]), which defendant does not make, we consider only the denial of defendant's motion pursuant to section 1118.1 for a directed verdict of acquittal.[30]

■ The corpus delicti rule requires that the prosecution establish the corpus delicti of the offense independently of the defendant's extrajudicial

[29] The verdict found that the murder had been committed during "commission and attempted commission of rape." Defendant admitted committing an act of rape. Although it is possible to attempt rape without committing a lewd and lascivious act on the body of the victim, in this case the jury found that a rape had been committed.

[30] Section 1118.1: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

statements, admissions, and confessions. (*People* v. *Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253].) However, "the prosecution is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather slight or prima facie proof is sufficient for such purpose." (*People* v. *Mehaffey* (1948) 32 Cal.2d 535, 545 [197 P.2d 12].)

■■■ If murder is charged, the People's burden is met by "evidence which creates a reasonable inference that the death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event." (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555].) As to any crimes that are charged the prosecution must establish the fact that the injury, loss, or harm occurred, and that a criminal agency was the cause. (*People* v. *Francisco* (1964) 228 Cal.App.2d 355, 358 [39 Cal.Rptr. 503].) Circumstantial evidence and inferences that may reasonably be drawn therefrom are adequate. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 679 [105 Cal.Rptr. 792, 504 P.2d 1256].)

This rule applies to special circumstance allegations as well as the underlying murder charge. (*People* v. *Mattson, supra*, 37 Cal.3d at p. 93.)

■■■ The corpus delicti rule operates initially to establish the foundation for admission of a defendant's extrajudicial admissions and confessions. However, once prima facie proof of the corpus delicti has been offered, and a defendant's confessions or admissions have been admitted,[31] those statements may be considered in determining all of the elements of the charged offenses that have been established. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 632 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *McMonigle* (1947) 29 Cal.2d 730, 738-739 [177 P.2d 745].)

■■■ Applying these rules, we conclude that a prima facie case was established as to each charge, and that the evidence at the close of the People's case was sufficient to sustain a conviction on appeal. Cheryl G. was abducted prior to her murder. When the body of a young girl who has been kidnapped is found in a remote location, with the bottom of her two-piece swimming suit missing, and her hymen has been lacerated, the circumstantial evidence that the victim has been sexually assaulted is strong. The physical injuries Cheryl G. suffered support the further inference that a forcible rape occurred. Independent prima facie proof of rape or attempted

---

[31] Defendant does not claim error in this regard in admitting his confessions.

rape and lewd and lascivious conduct was presented, therefore, in the People's case-in-chief.

The same is true with respect to the Adele C. murder and the kidnapping special circumstance. The victim was last seen leaving for work. She did not arrive. She had taken no money or other possessions with her. She did not hitchhike. Nothing in her background or conduct on the day of the disappearance suggested that she would voluntarily go to the area in which she was found, or that she would run away. The body was found in a remote location miles away from her home and place of employment, partially covered with leaves. Her pants and sweater were found in defendant's car, as was a map indicating the location at which the body was found. Stains and dirt on her clothing, which had been clean when she left home, indicated that she had engaged in a struggle while on the ground. This evidence was independent prima facie proof that her death was caused by a criminal agency, and that she had been kidnapped.

No authority supports defendant's further argument that the multiple-murder special circumstance (former § 190.2, subd. (c)(5)) required proof of a prima facie case of first degree murder. The corpus delicti requirement applies to felony-murder special circumstances by virtue of the command of former section 190.4 that felonies enumerated in former section 190.2 be pled and proved according to the general law. (*People* v. *Mattson, supra,* 37 Cal.3d at pp. 93-94.) The multiple-murder special circumstance is not among the enumerated felonies of former section 190.2, subdivision (c)(3). Probable cause is established under former section 190.2, subdivision (c)(5) if the evidence is such that the defendant may be convicted of first degree murder. (*People* v. *Williams, supra,* 44 Cal.3d 883, 925.) To withstand a section 1118.1 motion, nothing more than evidence sufficient to sustain convictions for two counts of murder, one of which is of the first degree, is required. Having concluded that proof of a prima facie case and proof sufficient to sustain the felony-murder special circumstances were offered in the People's case-in-chief, it follows that the evidence was sufficient to withstand defendant's section 1118.1 motion insofar as it was directed to the multiple-murder special circumstance.

### 5. *Ineffective Counsel.*

Defendant argues that his trial counsel rendered constitutionally ineffective assistance in failing to seek severance of the Kiz L., Cheryl G., and Adele C. charges from each other for trial. He argues that the prejudicial effect of "spillover" of evidence regarding the separate incidents on the jury determination of his guilt of the others was obvious at the first trial. The People suggest that counsel had a tactical reason for this omission since

the defense invited the jury to consider the similarity of the crimes with which defendant was charged and to which he had confessed, the defendant's assertedly false confession to the Deanna M. homicide, and to conclude that defendant falsely confessed to crimes of that nature. The record confirms that defendant's attorney had considered other defense strategies, and although aware of the risks had concluded that this defense was the best approach. He had discussed the strategy with defendant, who when questioned by the court as to his understanding and acquiesence affirmed his wish to utilize this defense.

We cannot say that this strategy was not one which a reasonably competent defense counsel would choose when aware of the physical evidence tying defendant to the crimes and faced with the ruling that defendant's confessions would be admitted. (See *People* v. *Williams, supra,* 44 Cal.3d at p. 922; *People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Quite apart from the apparent tactical reason for acquiescing in the joinder of counts, we have noted above the likelihood that the evidence would be cross-admissible since the similar modus operandi was probative on the issue of identity. (*People* v. *Bean, supra,* 46 Cal.3d at p. 937; *People* v. *Alcala* (1984) 36 Cal.3d 604, 632 [205 Cal.Rptr. 775, 685 P.2d 1126].) ▮ A claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]), but also that the motion or objection would have been meritorious, if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to defendant would have resulted. (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; *Strickland* v. *Washington* (1984) 466 U.S. 668, 696 [80 L.Ed.2d 674, 699, 104 S.Ct. 2052].)

▮ In light of the probability that the evidence would have been cross-admissible, and the equally strong evidence on each of the charges, it appears unlikely that the trial court would have exercised its discretion to grant such a motion. Denial of the motion would not have been an abuse of discretion. (See *People* v. *Bean, supra,* 46 Cal.3d at pp. 938-939.) Even assuming that the motion might have been granted, however, the state of the evidence is such that it is not reasonably probable that a more favorable outcome would have ensued had separate trials been held on each group of charges.

Defendant has the burden of establishing, based on the record on appeal (*People* v. *Williams, supra,* 44 Cal.3d at p. 917, fn. 12; *People* v. *Szeto* (1981)

29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213]) and on the basis of facts, not speculation (*People* v. *Williams, supra,* 44 Cal.3d at p. 937), that trial counsel rendered ineffective assistance. (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.) He has not done so. (Cf. *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].)

IV.

PENALTY PHASE ERROR

A. *Other Criminal Activity.*

Defendant claims that the trial court erred in admitting evidence regarding the circumstances underlying his 1971 conviction for rape and kidnapping, and a 1979 Nevada conviction for rape, kidnapping, and robbery. The evidence was offered as an aggravating factor under former section 190.3, factor (b), which permits the jury to consider the presence or absence of other criminal activity involving the use of force or violence. Defendant offered to stipulate that he had suffered the prior convictions, and assumes that only the fact of the prior convictions was relevant to the penalty determination. The assumption is unwarranted. (*People* v. *Karis* (1988) 46 Cal.3d 612, 639-640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Brown* (1988) 46 Cal.3d 432, 445 [250 Cal.Rptr. 604, 758 P.2d 1135].) There was no error.

B. *Expert Opinion Regarding Future Dangerousness.*

Defendant claims the prosecutor was improperly allowed to question expert witnesses regarding his potential dangerousness if he were to be sentenced to life in prison.

In *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 767-768, this court held that because a jury may place undue emphasis on the opinion of a psychiatrist that a capital defendant poses a danger to staff and other inmates in prison, and because predictions of future violent conduct are unreliable and frequently erroneous, the People may not offer such evidence at the penalty phase of the trial. Here, however, the evidence to which defendant now objects was elicited on proper cross-examination of defense witnesses. Defendant neither objected to the questions of the prosecutor nor moved to strike the witnesses' responses, which did not predict future dangerousness.[32] There was, therefore, no error cognizable on appeal.

---

[32] Defendant moved for mistrial, but on different grounds, claiming he had not been permitted to attempt to rehabilitate scrupled prospective jurors on voir dire about their ability to

Nor was there misconduct in asking the questions. Defendant's counsel had advised the jury in his opening statement that he would show that defendant had been mentally ill when the offenses were committed, but that since 1980, while incarcerated, had not been considered a threat to guards or other prisoners.[33] A defense psychiatrist testified that defendant was a schizophrenic and offered the testimony of correctional officers that defendant was a conforming prisoner who had given no indication that he might assault women while in prison.

■■■■ Evidence of future dangerousness may be introduced in rebuttal when the defendant himself has raised the issue of performance in prison and has offered evidence that in a prison environment he would be law-abiding. (*People* v. *Malone* (1988) 47 Cal.3d 1, 31 [252 Cal.Rptr. 525, 762 P.2d 1249].) The question was not improper.

### C. *Motion for Modification.*

Former section 190.4, subdivision (e), deems a defendant sentenced to death to have made application for modification of the verdict. In ruling on

vote for the death penalty if it were shown that the defendant could be safely housed in prison, and the prosecutor's disavowal at that time of an intent to offer evidence that defendant would be a threat. The trial court denied the mistrial motion with an observation that the cross-examination was "directed much more towards the comments made to Dr. Nuernberger by Mr. Mattson that he had a sensation in his head about women, and there was cross-examination I believe in that regard."

[33] Counsel stated: "We also intend to present evidence from correctional counselors that the defendant has been incarcerated in prison since 1980 and that while in prison he has had a good behavioral classification; he is not considered to be a threat to guards or to other prisoners, or to escape."

The first defense witness, Dr. Louis Nuernberger, a psychiatrist, had examined defendant in prison in 1980 and concluded that defendant suffered from "schizophrenia, undifferentiated type, accompanied by history of sexual sadism and abuses of multiple drugs and alcohol." After fairly comprehensive examination and cross-examination regarding the basis for and meaning of his findings, the prosecutor referred to a statement in the report prepared by the witness in which he had recorded defendant's statement that he had "a new and strange sensation present in his head" in the presence of female counselors. The witness acknowledged that he had included that information in the report because he believed it to be of some significance. Dr. Nuernberger had attempted to explore the subject because it was unique in his experience to have that sensation reported, but he was unable to get beyond the matter-of-fact statement made by defendant. He did not consider the statement ominous, but thought that defendant might be discovering something interesting about himself. The burden of the cross-examination was an attempt to undermine the basis of the witness's conclusion that defendant had been seriously mentally ill at the time he committed the charged offenses.

In this context the prosecutor asked if the feelings defendant described suggested that defendant wanted to attack or rape female counselors. Far from offering an opinion that defendant would be dangerous in prison, however, Dr. Nuernberger responded that he "had no reason to fear for the safety or welfare of any of the female or the male staff." Not only was the context quite different than an attempt to elicit an opinion on future dangerousness, but the opinion offered was that the witness did not believe defendant posed a threat to staff.

the application, the judge must review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in former section 190.3, and make an independent determination as to whether the jury's findings and verdict that aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge must also state on the record the reasons for his findings.

 Defendant contends that the judge failed to properly comply with former section 190.4, subdivision (e), because he considered the aggravating factors set out in the Sentencing Rules for the Superior Courts (Cal. Rules of Court, rule 401 et seq.), which are applicable to determinate sentencing, rather than the statutory factors applicable to capital sentencing as set out in former section 190.3. This "error," he maintains, caused the court to disregard the mitigating evidence he had introduced, in particular the evidence of mental illness and evidence suggesting he was not a danger to prison staff or other inmates.

The only basis petitioner offers for his assumption that the court failed to consider the evidence of mental illness is that the court "gave no indication" that it had done so.

The record confirms, however, that the judge fully complied with his obligations under former section 190.4. The court made express mention of the argument by defendant's counsel that a mentally ill defendant should not be executed, and stated that he did not believe defendant was seriously mentally ill at the time he committed the offenses. The reference to factors that are also considerations in determinate sentencing do not, as defendant suggests, reflect a failure to consider the statutory factors of the death penalty law. To the contrary, the statement offers the court's reasons for concluding, in the independent judgment of the judge, why after consideration of the evidence in mitigation and aggravation the judge believed that death was appropriate.[34] As in *People* v. *Turner, ante,* page 668 [268

---

[34] The court's statement and reasons were: "I think, though, when you come to the penalty phase, where [defense counsel] has seemed to rest his argument, requesting the Court to act as the [13th] juror making its independent judgment on the death penalty, the Court heard the testimony [of victims of past offenses].

"The Court also heard the testimony of the witnesses presented by the defendant as to [psychiatric and psychological] examinations conducted in [1979 or 1980], also the evidence as to his behavior while he was confined in San Quentin.

"The Court believes that the jury's verdict as to the death penalty in the penalty phase is definitely supported by the evidence. And the Court has and does make an independent determination that it is so supported.

"The court has also considered the argument of counsel that the death penalty is wrong and that government should not participate in taking another life, the fact that the defendant

Cal.Rptr. 706, 789 P.2d 887], the record satisfies us that the judge evaluated circumstances that were in evidence. While he did so under a normative framework for the imposition of determinate sentences, the factors considered were relevant to capital sentencing.

## DISPOSITION

The judgment is affirmed.

Lucas, C. J., Panelli, J., and Franson (Donald R.), J.,* concurred.

**KENNARD, J.,** Concurring.—I concur with most of the analysis in, and with the result reached by, the majority opinion. In my view, however, the

may have been seriously mentally ill or is, in fact, seriously mentally ill, and the Court must make a determination as to his moral culpability.

"We're not perfect. This Court is not perfect. But we do the very best we possibly can under the circumstances. And if we don't attempt to do that, it's just anarchy. And this Court is not going to participate in that. Each one of us have [*sic*] to be responsible for those acts that we commit. And I believe Mr. Mattson should be responsible for the acts he commits.

"I agree with counsel that some people may wish to take the life of another out of revenge or fear. I have no great joy in being here and having to listen to what Mr. Mattson participated in, nor do I believe either counsel had any great love of being here during the course of this trial.

"The fact of the matter is that's our job. And I believe that Mr. Mattson is definitely legally responsible under the law for his acts and should be so punished. And insofar as this Court or anyone is able to do so, he is probably morally culpable for it. But I can't make those judgments any more than anyone else can. Someone else is going to make those judgments.

"But I do not believe that Mr. Mattson was seriously mentally ill under the law at the time of these offenses. I don't know what kind of person does the type of things that Mr. Mattson does. But the evidence is abundantly, convincingly clear that he did it. And under the law, he should be punished.

"The Court has considered the fact that each of these crimes, each of them, involved great violence, great bodily harm, each one. Not only the ones for which he was tried in this court, but also in the penalty phase the evidence that was presented.

"Each one indicated a high degree of cruelty and viciousness in almost every instance, not the least of which the [nine]-year-old girl.

"But in each instance the victims were particularly vulnerable. All of his crimes have involved multiple victims. Each crime was carried out with premeditation. He has engaged in a pattern [of] violent conduct for many years prior to these offenses in 1978 which indicates he is a serious danger to society.

"He has served prior prison terms. He was on parole when he committed the offenses for which he was tried.

"The Court, in attempting to look at any circumstance in mitigation and reviewing the testimony that was presented at the time of the penalty phase of this case, the Court, in considering that testimony that was presented by the defendant, does not believe that any of those circumstances mitigate against the imposition of the penalty that this court intends to impose.

"The Court has exercised its discretion. It has made an independent judgment. Denies the defendant's motion to modify the sentence of the jury."

* Presiding Justice, Court of Appeal, Fifth Appellate District, assigned by the Chairperson of the Judicial Council.

majority errs in rejecting defendant's contention that his motion at the first trial to exclude his confessions was part and parcel of a motion brought under Penal Code section 1538.5[1] to suppress physical evidence seized as a result of the confessions, and in concluding that the motion was instead made pursuant to Evidence Code section 402. (Maj. opn., *ante,* at pp. 850-852.) By mischaracterizing the nature of defendant's motion, the majority skirts an important issue regarding the propriety of relitigating a section 1538.5 motion on retrial after a defendant's conviction has been reversed on appeal because of the trial court's improper denial of such a motion.

The majority acknowledges that section 1538.5 may be used to suppress *physical evidence* seized as a result of a violation of a defendant's Fifth or Sixth Amendment rights. (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 133, fn. 3 [219 Cal.Rptr. 186, 707 P.2d 248]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 235, fn. 1 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735 [125 Cal.Rptr. 798, 542 P.2d 1390].) But, as the majority points out, a motion to exclude a *confession* on such grounds is not cognizable under section 1538.5. (*People* v. *Superior Court (Zolnay), supra,* at p. 734.) The majority then concludes that when a defendant seeks to suppress both a confession and the physical evidence seized as a result of the confession, the motion must be deemed to be comprised of two logically and procedurally distinct components, a section 1538.5 motion to suppress the physical evidence and an Evidence Code section 402 motion to suppress the confessions.

The majority's analysis is squarely inconsistent with our holding in *People* v. *Superior Court (Zolnay), supra,* 15 Cal.3d 729 (hereafter *Zolnay*). In *Zolnay,* the defendants' confessions to the police resulted in the seizure of physical evidence. Asserting that they had not been fully advised of their constitutional rights as required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the defendants moved pursuant to section 1538.5 to suppress both their confessions and the evidence seized as a result thereof. In upholding the propriety of this procedure, we observed: "it is the unlawful seizure of tangible evidence, not the admission or confession, which permits a defendant to invoke the procedures authorized by section 1538.5." (15 Cal.3d at p. 734.) Nonetheless, we determined that once the procedures of section 1538.5 had been invoked to suppress the fruits of the confessions, the ruling on the *Miranda* issue became part of the section 1538.5 hearing. As we explained: "The physical evidence towards which the amended motion was directed was undeniably within the proper scope of section 1538.5. Since admissibility of the evidence depended upon whether or not a *Miranda* violation had occurred, a

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

ruling on the *Miranda* issue *necessarily became part of the section 1538.5 hearing. . . .* Our review of the admissibility of the physical evidence, which we undertake in accord with the provisions of section 1538.5, necessarily requires that we make a determination as to whether or not the trial court was correct in holding that a *Miranda* violation has occurred. Our ruling on that issue then becomes the law of the case and must be adhered to by the lower courts in future proceedings in this action. (See *People* v. *Shuey* (1975) 13 Cal.3d 835, 841-842 [120 Cal.Rptr. 83, 533 P.2d 211].)" (*Zolnay, supra,* 15 Cal.3d at p. 735, italics added.)

Here, as in *Zolnay, supra,* 15 Cal.3d 729, defendant's suppression motion at the first trial was properly brought under section 1538.5 because it sought to suppress physical evidence seized as a result of defendant's confessions. And, as in *Zolnay,* the trial court's ruling as to whether defendant's statements had been legally obtained became part of the section 1538.5 hearing.[2] Accordingly, I cannot agree with the majority that defendant's motion at the first trial to suppress both the confessions themselves and the physical evidence seized as a result thereof was not in its entirety a motion pursuant to section 1538.5.

On defendant's appeal following his first trial, we reversed the judgment of conviction based on our conclusion that defendant's confessions had been illegally obtained. (*People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887].)[3] On remand, the prosecutor attempted to relitigate the admissibility of the confessions based on new evidence. Because the ruling on this same issue at the first trial was made in the context of a section 1538.5 motion, the following question, which the majority found unnecessary to consider, must be addressed: When a conviction is reversed on appeal because the trial court erroneously denied a motion pursuant to section 1538.5, may the prosecution relitigate that motion on retrial, based on the presentation of new evidence?

---

[2] An examination of the transcript of the suppression hearing at the first trial shows that the motion to suppress the confessions was made a part of the section 1538.5 motion. At the hearing, the court stated: "As part of your moving papers, Mr. Beyersdorf [defense counsel], you have included statements of the defendant. The Court does not normally litigate the admissibility of statements as part of a 1538.5 motion but rather the matter [may] be raised at [an Evidence Code section] 402 motion. However, with the agreement of counsel I am willing to hear that part of the motion." The prosecutor responded: "Yes, Your Honor. People will stipulate. Since that part of the motion is *completely encompassed* in the motion we are going to hear now [i.e., the section 1538.5 motion], it would just be a duplication at a later time." (Italics added.) After a brief discussion, the court concluded: "By the agreement of counsel the Court will permit you to litigate the admissibility of statements *as a part of the 1538.5 motion.* " (Italics added.)

[3] Our opinion in the earlier appeal in this case did not indicate whether the trial court's ruling on the admissibility of defendant's confessions was made in the context of a section 1538.5 motion or a motion under Evidence Code section 402. (See *People* v. *Mattson, supra,* 37 Cal.3d 85, 89-92.)

The majority points out (*ante,* at p. 850) that ambiguous language in certain decisions by this court (e.g., *People* v. *Brooks* (1980) 26 Cal.3d 471, 483 [162 Cal.Rptr. 177, 605 P.2d 1306]) might be read to suggest that relitigation of a section 1538.5 motion is statutorily barred, but the majority makes no attempt to resolve the ambiguity. I would address this issue and conclude, for the reasons set forth below, that a section 1538.5 motion may be relitigated on the basis of new evidence following appeal and reversal of a judgment of conviction.

Prior to the enactment of section 1538.5, the law was clear: Following a reversal of a trial court's denial of a motion to suppress illegally seized evidence, the prosecution *could* introduce new evidence to relitigate the issue. (*People* v. *Carswell* (1959) 51 Cal.2d 602, 608 [335 P.2d 99].) Section 1538.5 is devoid of language indicating a legislative intent to change the rule we articulated in *Carswell.* Nevertheless, defendant maintains that relitigation is barred. In support, he cites *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Shuey* (1975) 13 Cal.3d 835, 841-842 [120 Cal. Rptr. 83, 533 P.2d 211]; and *People* v. *Brooks, supra,* 26 Cal.3d 471. None of these cases, however, compels the result urged by defendant.

In *Lorenzana* v. *Superior Court, supra,* 9 Cal.3d 626, after the trial court's denial of his motion to suppress evidence under section 1538.5, the defendant sought relief by means of a pretrial petition for writ of mandate. In response, the prosecution argued that, instead of issuing the writ sought by the defendant, the reviewing court should remand the matter to the superior court to provide the prosecution with an opportunity to argue that the fruits of the search would inevitably have been discovered despite the illegality. In refusing to do so, we explained: "To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility is initially raised." (9 Cal.3d at p. 640.)

In *People* v. *Brooks, supra,* 26 Cal.3d 471, the defendant moved under section 1538.5 both "to traverse the search warrant" because its supporting affidavit contained misstatements and did not establish probable cause, and "to declare entry invalid" for failure to comply with the knock-and-notice requirements of section 1531. The trial court bifurcated the proceedings and heard evidence only on the first issue. It then granted the motion, resulting in dismissal of the case. The People appealed, and the Court of Appeal reversed. On retrial, the defendant filed a new motion to suppress; this time he presented evidence that the police had failed to comply with section 1531. The trial court granted the motion and dismissed the case. Again the

People appealed, arguing that the defense was barred under *Lorenzana* from presenting new evidence at the second section 1538.5 hearing. We rejected the contention. While reaffirming the principles we had set forth in *Lorenzana, supra*, 9 Cal.3d 626, we concluded that *Lorenzana* was factually distinguishable from *Brooks.* As we explained: "Where . . . the trial court elects to bifurcate the suppression hearing, grants the defendant's motion on the first ground presented, and is subsequently reversed on appeal, the reviewing court should remand to the trial court for disposition of the alternate grounds for suppression." (*Brooks, supra*, 26 Cal.3d at p. 483.)

Neither *Brooks* nor *Lorenzana* holds that the prosecution is barred from relitigating a section 1538.5 motion on the basis of new evidence after a defendant's conviction is reversed on appeal because of the trial court's erroneous denial of the section 1538.5 motion. *Lorenzana, supra*, 9 Cal.3d 626), simply establishes that, when presented with a meritorious petition for writ of mandate, an appellate court should issue the writ and direct the trial court to grant the suppression motion, rather than to remand on the theory that the prosecution might be able to present additional evidence to justify the search. Although *Brooks* more closely resembles the present case because it involved an appeal rather than a pretrial writ it too did not establish a rule barring further litigation; indeed, we specifically determined that the trial court had properly permitted the defense to present new evidence following reversal on appeal. (*People* v. *Brooks, supra,* 26 Cal.3d at p. 483.)

Equally misplaced is defendant's reliance on *People* v. *Shuey, supra*, 13 Cal.3d 835 (*Shuey II* ). The procedural history leading to that decision is as follows. After the trial court's denial of their section 1538.5 motion, the defendants sought a writ of mandate from the Court of Appeal. That court granted the writ and directed the trial court to determine whether the evidence sought to be suppressed was the fruit of the illegality. (*Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535 [106 Cal.Rptr. 452] (*Shuey I* ).) On remand, the People requested permission to argue an additional theory, one that—according to the opinion in *Shuey I*—they had expressly disavowed at the original hearing. The trial court denied the request and granted the motion to suppress. The People appealed; a different division of the Court of Appeal reversed, holding that the Court of Appeal in *Shuey I* had mischaracterized the record and that the prosecution had never "expressly disavowed" the new theory. We granted a hearing and held that the Court of Appeal's determination that *Shuey I* was erroneous violated the doctrine of law of the case. (*Shuey II, supra*, 13 Cal.3d at p. 843.)

Nothing in *Shuey II* suggests there is anything in the language of section 1538.5 to bar relitigation of a suppression motion brought under that statute following reversal by an appellate court. There, we simply applied

general principles of law of the case, a doctrine "exclusively concerned with issues of law and not fact." (*Shuey II, supra,* 13 Cal.3d at p. 842.) We concluded that because of the Court of Appeal's holding in *Shuey I* that the prosecution at the first trial had "expressly disavowed" the additional theory of admissibility it presented at the retrial, that court had resolved a question of *law,* which was therefore binding under the doctrine of law of the case. In this case, however, the prosecution attempted at defendant's retrial to present new *facts* relating to conversations between defendant and Detective Dingle on September 26, 1978. As the majority correctly points out (*ante,* at pp. 852-853), the doctrine of law of the case does not apply to the determination of questions of fact based on new evidence following reversal on appeal.

In sum, here the prosecution's relitigation of the section 1538.5 motion was appropriate. The statute does not bar such a procedure. And while the doctrine of law of the case precludes a reconsideration of previously resolved questions of law, it does not bar relitigation based on the presentation of facts that are sufficiently significant to bring about a different result. In this case the additional evidence that the prosecution presented at the reopened suppression hearing supports the trial court's ruling that defendant's confessions and the physical evidence seized as a result thereof were admissible.

**MOSK, J.**—I dissent. In *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887] (hereafter *Mattson I* ), this court held that the purported confessions of defendant were invalid as a matter of law. (*People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) Thus the previous decision of this court is the law of the case.

The majority concede that the law of the case is controlling as to the law, but they seem to obliquely hold that we are here considering only new facts and not law. They are in error. We are here concerned with the very same confessions introduced in the first trial. If there were any new confessions offered in this trial, the majority fail to identify them.

Thus the facts in this trial are the same as those in the previous trial— embellished somewhat, changed here and there because of the passage of time and fading memories, somewhat more self-serving by prosecution witnesses, but essentially the same. The only issue, therefore, is the law applicable to those facts. And the law was forthrightly established in *Mattson I.* We are bound by that law.

The majority strain mightily to find some distinguishing law and to shift constitutional grounds. In *Mattson I* we relied on article I, section 15, of the

California Constitution. (37 Cal.3d at pp. 89-92.) But more important, we made it abundantly clear that "It is settled that the introduction of a confession obtained in violation of constitutional guarantees is prejudicial per se and that a conviction based on such a confession must be reversed." (*Id.* at p. 91.) That clearly meant *any* constitutional guaranty.

It is unfortunate that the prosecutor did not get the message of this court's previous opinion: that he must attempt to convict this defendant without the use of the purported confessions. Instead, with the acquiescence of the trial court, he charged ahead with the same confessions that had been found constitutionally invalid. While courts may change, the Constitution remains the same.

I would reverse the judgment.

**BROUSSARD, J.**—I dissent. When this case was before this court on appeal after defendant's first trial, we reversed defendant's convictions on the ground that a confession obtained in violation of the privilege against self-incrimination had been admitted in evidence. (*People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887].) I agree with Justice Mosk that at defendant's second trial, the People had no authority to seek to relitigate that determination by the presentation of new evidence and a new theory supporting the admissibility of the confession.

As Justice Kennard demonstrates in her concurring opinion, the issue of the admissibility of the statements arose at the first trial in the context of a motion under Penal Code section 1538.5.[1] It is true that a motion pursuant to section 1538.5 will not lie to suppress a confession on the sole ground that the confession was obtained in violation of the privilege against self-incrimination. (*People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390].) Nonetheless, when it is argued, as it was in this case, that physical evidence was illegally seized as the fruit of an improperly obtained confession, a decision whether the confession was illegally obtained must be made in the context of the section 1538.5 hearing. As we have explained, in such a situation "a ruling on the [confession] issue necessarily *became part* of the section 1538.5 hearing. . . . Our review of the admissibility of the physical evidence, which we undertake in accord with the provisions of section 1538.5, necessarily requires that we make a determination as to whether or not the trial court was correct in holding that a *Miranda* violation has occurred. [*Miranda* v. *Arizona* (1966) 384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974).] Our ruling on that issue then becomes the law of the case and must be adhered to by the lower

---

[1] All further statutory references are to the Penal Code.

courts in future proceedings in this action. [Citation]" (15 Cal.3d at p. 735, italics added.)

Justice Kennard would hold that although the ruling on the admissibility of the confession was properly part of the section 1538.5 hearing in this case, the factual basis for the determination can be relitigated after the reversal of the conviction on appeal. Here I part company with Justice Kennard. In my view, the parties are required to litigate all the factual and legal predicates for a ruling on a motion pursuant to section 1538.5 at the hearing; they are not allowed to reserve evidence or legal argument for a rainy day. The admissibility of the confession was a legal predicate for the ruling on the suppression of physical evidence, and the People were required to fully litigate it at that hearing.

We have determined that the parties are obliged to present all their evidence and theories regarding the suppression of evidence at the hearing pursuant to section 1538.5. Having determined that the evidence should be suppressed, we have refused to remand to permit relitigation of the suppression motion on a new theory necessitating a new evidentiary hearing. Thus in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33], defendant sought a pretrial writ to overturn the denial of his section 1538.5 motion. We agreed with him and reversed the trial court. The People argued that we should remand to the trial court to allow them to argue a new theory, that is, inevitable discovery. We refused, referring to the purpose of section 1538.5 to "avoid the continued relitigation of the question of the admissibility of evidence." (9 Cal.3d at p. 640.) We continued: "All parties faced the obligation of presenting *all their testimony* and arguments relative to the question of the admissibility of the evidence at that time. If the People had other theories to support their contention that the evidence was not the product of illegal police conduct, the proper place to argue those theories was on the trial level at the suppression hearing. . . . To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is initially raised. [Citation. Fn. omitted.]" (9 Cal.3d at p. 640, italics added.)

There can be no basis for concluding that the *Lorenzana* rule applies only to pretrial review of rulings on suppression motions, but not to a judgment which is reversed on appeal. If the policy of section 1538.5 is to require full and final litigation of the factual basis for the suppression claim at the first hearing, that policy applies whether the ruling on the motion is challenged before or after trial. Indeed, section 1538.5 is explicit in affirming that the

People are bound by the judgment of the reviewing court when the People seek review of a ruling by appeal *or* writ. (§ 1538.5, subd. (j).)

Of course, a trial court may determine that one argument for the suppression of evidence is determinative, and may choose to hear evidence only on that point. In such a case the trial court limits the issues, and if the court is reversed on appeal the remaining issues may be litigated—for the first time. (*People* v. *Brooks* (1980) 26 Cal.3d 471, 482-483 [162 Cal.Rptr. 177, 605 P.2d 1306].) But this rule gives the People no comfort in this case, because it allows postappeal litigation only of issues which were actually presented at the first hearing.

Here, the People failed to make the argument or present the evidence at the first hearing that persuaded the court at the second hearing to admit the confessions. To allow such a procedure is grossly wasteful of judicial resources, requiring, as it did, a second full capital trial. It also calls into question the reliability of the proceedings by giving too much scope for what Justice Mosk politely refers to as "embellished" testimony. I would abide by our decision the first time this case was before us, and reverse the convictions.

Appellant's petition for a rehearing was denied July 11, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.