Filed 6/12/24  P. v. Galvan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083430 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV20002080) |
| RICHARD ALLEN GALVAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Mary E. Fuller, Judge.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winter, Chief Assistant Attorney General, Charles C. Ragland, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Richard Allen Galvan of one count of sexual intercourse with a child 10 years old or younger (Penal Code,[1] § 288.7, subd. (a)). Galvan claims the court erred by failing to instruct the jury on the lesser-included offense of statutory rape because there was substantial evidence that the victim (Jane Doe) was 11 years old at the time of the rape. The People concede the court erred by failing to give the instruction, but argue the error was harmless in light of (a) the jury's specific finding that Doe was 10 years old or younger, and (b) the comparative strength of the evidence supporting such a conclusion. We agree that the evidence Doe was no more than 10 years old at the time of the crime is significantly stronger than the evidence indicating she was 11. As a result, the record as a whole supports a conclusion that the jury would likely not have chosen the lesser-included offense. Accordingly, we find Galvan was not prejudiced by the court's failure to instruct the jury on the lesser-included offense of statutory rape.

Separately, Galvan argues the trial court erred by permitting the law enforcement official who interrogated him to provide commentary on the veracity of Galvan's statements. The People argue, among other things, that Galvan failed to preserve this argument for appeal because defense counsel did not make a proper objection to the testimony at trial. We agree that Galvan's failure to make a specific and timely objection precludes him from challenging the judgment on this ground. Accordingly, we affirm.

---

[1]     Further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Doe was born in January 2006. Her mother and father divorced when she was young, and they shared custody of Doe and her younger sister for several years. Father's living arrangement was often unstable, and he hosted weekend visits with the girls first at his girlfriend's house and later in hotel rooms or his big rig truck. The evidence varies as to the exact timeline, but at some point, Father moved into a room in Galvan's house, where Doe and Sister would visit.

According to Doe, during a December 2015 visit, Father left her alone in his room at Galvan's house and took Sister to the store. She testified that while Father and Sister were gone, Galvan came into the room and raped her. Doe testified she did not tell anyone about the assault until April 2020, when she disclosed it to Mother, Sister, and a cousin.

After Mother contacted law enforcement, Galvan was arrested and charged. Following trial, a jury convicted Galvan of a single count of engaging in sexual intercourse with a child 10 years of age or younger.

## DISCUSSION

### A. *Instruction on Lesser-Included Offense*

Galvan argues the trial court had a sua sponte obligation to instruct the jury on statutory rape as a lesser-included offense of engaging in sexual intercourse with a child 10 years of age or younger because there was substantial evidence that Doe was 11 at the time of the rape. " ' "[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a

3

reasonable jury could find persuasive." ' " (*Ibid.*)  The reviewing court applies the independent judgment standard of review to the trial court's failure to instruct on a lesser included offense.  (*People v. Waidla* (2000) 22 Cal.4th 690, 739.)

Here, the relevant question is whether there was evidence from which a reasonable juror could conclude that Doe was 11 years old rather than 10 when the act of sexual intercourse occurred.  Based on this standard, the People concede that the trial court should have instructed the jury on statutory rape.  However, they make two distinct arguments that the error was harmless.

The People first contend the jury necessarily found that Doe was "10 years of age or younger" at the time of the crime because it was an element of the charged offense.  As a general rule, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under *other* properly given instructions."  (*People v. Lewis* (2001) 25 Cal.4th 610, 646, italics added.)  But instructions concerning the crime of conviction itself do not ordinarily meet this standard.

The purpose of requiring sua sponte instructions on lesser-included offenses is to avoid "forc[ing] the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence."  (*People v. Barton* (1995) 12 Cal.4th 186, 196.)  In an ordinary appeal alleging failure to instruct on a lesser-included offense, the jury has convicted the defendant of an offense by finding certain elements—say, A+B+C.  Defendant argues the jury should have been instructed on a lesser-included offense consisting of just

4

some of those elements—say, A+B.  Usually, the jury will have been specifically instructed on the extra element, C, and (because the offense of conviction is A+B+C) it will always have found C.  If finding C were sufficient to establish harmless error, "the rule requiring instructions on lesser included offenses in this or similar circumstances would be effectively eviscerated." (*People v. Hayes* (2006) 142 Cal.App.4th 175, 183.)  Such is the situation in this case.

We thus turn to the People's alternative argument, that there is no reasonable possibility the jury would find Galvan guilty of statutory rape instead of sexual intercourse with a child 10 years of age or younger.  While the People have conceded there is minimally substantial evidence from which " ' "a jury composed of reasonable [persons] *could . . . conclude*[ ]" ' that the lesser, but not the greater, offense was committed" (*People v. Breverman* (1998) 19 Cal.4th 142, 158), harmless error review "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Id.* at p. 177.)  An error may be harmless if "the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different, outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Ibid.*)

The essential dispute concerns when Father lived with Galvan and whether Doe continued to visit Father at Galvan's residence after she turned 11 years old in January 2017.  Witnesses gave differing accounts about when Father moved in and the duration of his tenancy.

Mother testified that Father said he was moving into Galvan's house in the spring of 2015.  Family court papers Mother served on Father reflect that they were served by mail in May 2015 at Galvan's address.

Father could not recall exactly when he moved in, but believed that Doe was seven or eight years old at the time, which would have been in 2013 or 2014. Father testified that he was served with the family court paperwork at Galvan's home and never used Galvan's mailing address until he moved in. He also said, however, that he was not sure if he could have moved in during 2016 instead of 2015. He did not have a firm recollection of how long Doe and her Sister visited him at Galvan's house—"A couple years. Like, you know, two, two and a half years -- three possibly"—but he did "remember [he] had spent two Christmases there."

Galvan testified that Father moved in on June 4, 2016, and did not live there at any point in 2015. Galvan presented a spiral-bound notebook with "[Father's name] Rent" on the first page and a purported rent ledger from June 2016 through July 2017. Galvan testified that this ledger represented the entirety of Father's tenancy. Galvan also suggested, however, that he began keeping the ledger because Father had trouble paying rent on time prior to June 2016:

> "[Defense Counsel:] Is there a reason why you kept a ledger of payments for [Father]?
>
> "[Galvan:] Yeah. Because right off the beginning, he always used — he wouldn't give me the full amount of rent payment because he would say, well, I had to pay the child support this month so I am kind of left broke. Or I had my truck payment. Or I got a lawyer for the family matter. Or I got to pay the IRS. So that is why I started keeping track of all, of every month from June 16 . . . ."

Galvan also acknowledged that previous pages had been ripped out of the notebook, and that he had "no idea" what had been on those pages. Galvan testified inconsistently as to the first entry, a figure of $885, first testifying that it represented the amount Father owed in rent, then testifying that the

6

rent was only $300 and he had also loaned Father money. He also agreed when the prosecutor asked, "That notebook wasn't quite as accurate as you would like the jury to believe; was it?" Galvan testified that Father moved out in May or June 2017 and that Doe and Sister were still visiting Father at the house in 2017.

Galvan's son, who lived with Galvan and Father, testified that Father moved in "more or less . . . 2015" and lived there in "2017, 2016." It appears that his recollection was influenced by Galvan's rent ledger, and he testified that Father moved out "more or less" on the last date listed in the ledger.

Galvan's friend (who at the time of trial was also a tenant in the house) testified that Father moved out "probably in . . . [']17 before Christmas. It was around Christmas" of 2017. She stated that in 2017 she lived down the street and would sometimes stop by Galvan's house.

Galvan's cousin testified that there was a period in which Father was still living in Galvan's house, but the girls were no longer visiting.

Doe consistently said, before and during trial, that Galvan raped her when she was nine or 10 years old. Doe recalled that "every card and calendar" in Galvan's house said 2015.

The only witnesses who testified to contemporaneous evidence of the rape agreed on the relative timing. Doe testified that she remembered the assault specifically because it was the same month as Christmas. Mother recalled a weekend in December 2015 where Doe called, said she had a headache, and asked to be picked up early. Mother said that when she picked Doe and Sister up, Doe "just looked awful" and "said [she] can never go back there again." Mother testified this happened "before Christmas."

Sister similarly remembered an incident one year "before Christmas" where she and Father left Doe at Galvan's house. When they returned,

7

Doe "was crying" and would only say that "her head hurt." The following week, Doe "kind of just stayed in [her] room" at Mother's house, crying. Sister did not remember the year.

Doe's family all recounted that visits with Father stopped after she said she did not want to return to Galvan's house. Doe and Mother testified the girls never went back to Galvan's house after December 2015. Sister testified they continued to visit their Father for "a few months" after she found Doe crying. Father testified that when Doe was nine or 10 years old, she told him she did not want to go to Galvan's anymore, and that he moved out almost immediately after that.

Looking at the trial record as a whole, evidence that Galvan raped Doe sometime after January 2017, when she turned 11 years old, was comparatively weak. Doe was confident that the rape occurred in December 2015, before Christmas. Both Mother and Sister remembered different aspects of an event where Doe was upset before Christmas one year and testified that visits with Father stopped that weekend or shortly thereafter. There was no evidence that the rape occurred sometime other than near Christmas. We thus have little reason to think the jury would have credited the testimony that the rape happened, but discounted its accuracy as to the relative timing.

Father remembers receiving service papers that were delivered to Galvan's residence in May 2015. Only Galvan himself denied that Father lived in the house in 2015. The evidence was thus fairly strong that Doe was visiting Father there before Christmas 2015.

But even assuming the jury credited Galvan and his rent ledger entirely, and thus believed that Father lived with Galvan from mid-2016 through mid-2017, Doe would have been 10 years old before Christmas 2016.

8

Notably, the defense argued in closing that if Doe was raped in 2015, it was not by Galvan "[b]ecause [Doe] didn't stay at [Galvan's] house . . . in 2015." Nothing was said about the possibility that the rape occurred in December 2016. Thus, even under Galvan's timeline, the evidence is strong that Doe was not yet 11 years old at the time of the rape.

By comparison, only one witness testified that Father continued to live with Galvan around Christmas 2017—a friend who would sometimes stop by Galvan's house. This friend had no particular reason to keep track of when Father was living in the house or when the girls stopped visiting.

In sum, the record does not support that a reasonable jury was likely to have convicted Galvan of the lesser offense of statutory rape based on concerns that she had already turned 11 years old at the time of the crime. Accordingly, Galvan was not prejudiced by the instructional error.

## B.     *Admission of Evidence Bearing on Galvan's Veracity*

Galvan argues that the trial court erroneously admitted opinion testimony from a police officer. He contends that the testimony was improper because neither lay witnesses nor expert witnesses are permitted to offer opinion testimony about the truthfulness of statements made by another person. The People counter that Galvan failed to make a timely and specific objection at trial, and thus failed to preserve this issue for appeal.

We cannot reverse a judgment for erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion[.]" (Evid. Code, § 353, subd. (a).) It is not sufficient that *some* objection was interposed; the objection must be sufficient "to enable the court to make an informed ruling on the motion or

9

objection and to enable the party proffering the evidence to cure the defect in the evidence." (*People v. Mattson* (1990) 50 Cal.3d 826, 854.)

The detective who interviewed Galvan testified at trial that he "was looking down the entire time" he denied raping the victim. The prosecutor then asked, "What, if anything, does that mean to you?" The detective responded:

> "[Detective:] In my experience when I am interviewing, we typically will look at each other. And then that is one of the indicators, going through that class, that is one of the indicators when we start to believe that maybe the answers aren't truthful is when they don't look into your eye when they are telling you an answer. It's just human nature."

Defense counsel interjected, "Objection, Your Honor, to human nature." The court overruled this objection, and the prosecutor went on to ask more questions on this topic, without objection from the defense:

> "[Prosecutor:] So when you were discussing other things with the defendant other than specific accusations, would he look you directly in the eye?
>
> "[Detective:] Yes. Excuse me. Yes.
>
> "[Prosecutor:] Was it only when he would make these denials that you were asked about where he would look down at the floor?
>
> "[Detective:] Once we got into the specifics of the incidents and more of the actual crime itself and the elements of those, you know, the things that he did, that is when he started looking at the ground. He never really looked up. So, the beginning of the interview when we are talking about where he lives and that kind of thing, he was conversing and looking at me and then communicating. And once I got into that, he started looking down."

Galvan does not contend the detective could not testify to what he observed about where Galvan was looking when he answered various inquiries during the interview. Indeed, this is the focus of most of the detective's testimony. Rather, he suggests that the detective's comments in response to the prosecutor's question—"What . . . does this mean to you?"—amounted to an opinion that Galvan was not telling the truth. Although there was no objection as to improper opinion testimony, Galvan maintains that counsel's objection "to human nature" fairly preserves the argument that the officer was improperly offering an opinion on Galvan's veracity. But Galvan's argument on appeal is not about the effect of the phrase "human nature," or the detective's qualifications to testify about "human nature," but the impropriety of the detective commenting on the veracity of specific statements. "Human nature" did not fairly alert the trial court to this issue. (See, e.g., *People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21 [objections regarding relevance, non-responsiveness, foundation, and speculation did not "alert the trial court to the claim that the testimony objected to is inadmissible character evidence"].)

Galvan resists this conclusion, claiming that counsel's objection was sufficiently specific because she "was objecting to *his opinions* on how people act when they are lying, i.e., human nature." We do not agree that the trial judge would reasonably understand an objection to two particular words used by the detective as conveying a conceptual objection to the entirety of his answer. Galvan seeks to interpolate more than the bare phrase "human nature" encompasses. Nor is it enough that the objection could be seen to have some general relationship to the argument pressed on appeal. (See, e.g., *People v. Abel* (2012) 53 Cal.4th 891, 928–929 ["Although [defendant] asserted the evidence 'pushed up' against the edges of Evidence Code

11

section 1101 [prohibiting character evidence], he did not object that it *was* inadmissible character evidence, thus forfeiting the claim."]; *People v. Coleman* (1988) 46 Cal.3d 749, 776–778 [Evidence Code section 402 objection to expert's selection of tests used to analyze semen samples did not preserve challenge to that expert's testimony concerning the statistical significance of the test results]; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 [although defendant filed a motion in the trial court arguing under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), that her statements were coerced, "[b]ecause she did not raise the issue of the substantive adequacy of the *Miranda* warnings in the trial court, [she] forfeited that issue on appeal"].)

Galvan also claims that a specific and timely objection would have been futile because the court gave an expert witness instruction over defense counsel's opposition. "Objection may be excused if it would have been futile . . . ." (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

At the charge conference, after the defense rested, counsel objected to an expert witness instruction. She argued that the detective "was never actually tendered . . . as an expert" and had the prosecution done so, she "would have asked for limitations as to what he could testify to." Counsel said she would have objected to the detective's testifying "as an expert" because his testimony would be "given unnatural weight." She complained about the detective proffering the "opinion [that] if you don't look at me, you're adopting what I am saying" specifically because, "[t]hat is not something that is universally accepted. That is not universally accepted. That is only his personal opinion. But that is not universally accepted in scientific community. And within the expert's community, you have to have something that is accepted."

The trial court concluded that it would give the expert opinion instruction because the defense "offered him as an expert" by having "him testify about the specific classes on interrogation interviews that he has done" after the prosecution "had him testify about his general training and experience." The court said that, in light of this testimony, it would give the instruction and leave to the jury whether to consider him an expert or not.

This exchange does not show that a specific and timely objection would have been futile. Counsel never identified the legal issue Galvan presses on appeal, which is not dependent on whether the detective was considered an expert. Because the court never considered or ruled on the propriety of the detective testifying to the veracity of specific statements, we cannot conclude that it would have overruled a proper objection.

Finally, even if a proper objection was made, or the failure to do so was excused, any error in allowing the detective's testimony did not likely affect the jury's ultimate conclusion. As we have noted, and Galvan concedes, it was appropriate for the detective to describe Galvan's demeanor during questioning, including the fact that he consistently declined to make eye contact when he denied the critical allegations. Even had the detective not suggested that Galvan's denials were "maybe" untruthful, the jurors would likely have drawn the same conclusions about Galvan's credibility based on properly admitted testimony. Moreover, because Galvan testified on his own behalf before the detective testified, the jury had the opportunity to assess the credibility of his denials for itself. This further decreases the likelihood that the detective's insinuation affected the jury's verdict.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.